RUFUS STORY, Appellant, *v.* THE NEW YORK ELEVATED RAILROAD COMPANY, Respondent.

The rule, that where lands in a city or village are laid out by the owner into lots and streets, and a map is made thereof, and where, in the description in a conveyance of one or more of such lots, which are designated upon the map as abutting upon a street, the map is referred to, the grantee acquires, as against the grantor, a right of way over the strip of land referred to as a street, and that the grantor cannot thereafter appropriate such land to any use inconsistent with its use as a public street, applies to a municipal corporation when it deals with lands as owner.

The city of New York having power to lay out and open streets, and to acquire lands for that purpose, has power to dedicate its own lands to such a use, and to bind itself by covenant with its grantees of abutting lands, that lands so dedicated shall be forever kept as a public street.

The said city prior to 1773 caused certain lands under water of the East river, owned by it, to be surveyed and laid out into streets and lots, and designated upon a map thereof. In that year it conveyed by separate grants two of said lots adjoining each other, which, as so surveyed and mapped, were crossed by one of said streets designated on the map as W. street (now F. street). Each grant described the lot by the metes and

bounds shown upon the map, and stated it to be of a specified width on the north side and of another specified width on the south side of said street. Each deed contained a covenant on the part of the grantee to "build and erect" said street and other streets, portions of which were included in the boundaries of the grant, which the deed declared "shall forever thereafter continue and be for the free and common passage, and as public streets and ways for the inhabitants and all others * * * in like manner as the other streets of the same city now are or lawfully ought to be." The grantees made and constructed the streets mentioned in the grants. *Held*, that, conceding the city retained the fee of W. street, it dedicated it to the use specified, and covenanted that it should forever be kept open as a street for the benefit of the abutting property ; that the right thus secured constituted an easement which became at once appurtenant to the land conveyed and formed "an integral part of the estate" in it, and constituted property within the meaning of the provision of the State Constitution (Art. 1, § 6), which prohibits the taking of private property without just compensation.

Plaintiff claimed portions of said lots through various *mesne* conveyances which described the land conveyed as "bounded northerly in front" on F. (formerly W.) street. Upon the land conveyed was a warehouse occupying the whole front on said street. In an action to restrain defendant from constructing an elevated railroad upon said street it appeared that, with the consent of the municipal corporation, it proposed to construct such road about fifteen feet above the surface of the street, supported upon columns placed along and partly inside of the outer edge of the sidewalks and extending across the whole traveled track of the street. The trial court found that this construction and the passing trains would, "to some extent, obscure the light" * * * * * and impair the general usefulness of the plaintiff's premises also, "that the line of columns abridges the sidewalk and interferes with the street as a thoroughfare," and the road would incidentally damage plaintiff's premises and depreciate its value. *Held*, (MILLER, EARL and FINCH, JJ., dissenting), that the proposed structure was incompatible with and destructive of the use of the street as such, and unless plaintiff's property rights, so far as interfered with, were properly acquired and compensation made therefor, would violate not only said constitutional provision, but also the statutes by which defendant is bound (Chap. 606, Laws of 1875 ; chap. 140, Laws of 1850 ; chap. 697, Laws of 1866 ; chap. 489, Laws of 1867), and that the action was maintainable.

*People* v. *Kerr* (27 N. Y. 188), *Kellinger* v. *F. S. S. R. Co.* (50 id. 206), *T. Co.* v. *Chicago* (99 U. S. 635), *Lansing* v. *Smith* (4 Wend. 21), *Gould* v. *H. R. R. R. Co.* (6 N. Y. 522), distinguished.

*It seems* that by the grants from the city, the fee of said street was conveyed, the city reserving simply an easement, *i. e.*, the right of public use as a street ; also (MILLER, EARL and FINCH, JJ., dissenting), that plaintiff's deed conveyed to him the fee of one-half the street opposite his premises.

90   122
154   557
90   122
168  ¹147
90   122
169  ⁷285

*It seems* also, that where the fee of land has been taken by the city in trust to be kept open and used as a public street, as authorized by the act of 1813 (2 R. L. 49, § 177), no structure can be authorized upon it which is inconsistent with the continued use thereof as a public open street.

The authorities upon the subjects of easements appurtenants to and of covenants running with lands, also as to legislative and municipal control over streets collated and discussed.

(Argued June 7, 1882 ; decided October 17, 1882.)

Appeal from judgment of the General Term of the Court of Common Pleas in and for the city and county of New York, entered upon an order made November 10, 1879, which affirmed a judgment in favor of defendant, entered upon a decision of the court on trial at Special Term.

This action was brought to restrain defendant from constructing its road in that portion of Front street, in the city of New York, opposite plaintiff's premises.

Plaintiff is the owner of premises known as Nos. 7 and 9 Front street, in said city. His deed described the premises conveyed as follows :

" All that certain lot of land situate, lying and being in the first ward of the city of New York aforesaid, on the southeasterly corner of Moore and Front streets, bounded northerly in front by Front street aforesaid, easterly by ground conveyed by John S. Conger and Sarah, his wife, to Elias H. Herrick, by deed bearing date the first day of May, 1839, southerly by ground now or late of the said Elias H. Herrick, and westerly by Moore street aforesaid ; containing in breadth on Front street thirty feet ten inches, and in the rear thirty-eig^ ... t ten inches, and in length on each side eighty feet, be th more or less."

Prior to the year 1773 the said premises formed part of lots usually described as water lots, which belonged to the c poration of the city of New York, and which were part of tract of land under water in the East river, which the city h caused to be surveyed and laid out into lots and stree.

and designated on a map. The said water-lots were granted and conveyed by the city by two grants. One made to Isaac De Peyster, dated December 2, 1773, the other Thomas Ellison, Jr., dated December 26, 1773. The descriptions in said grants are in similar terms; that in the De Peyster deed is as follows:

" All that certain ground and water lot, situate, lying and being in the south ward of the city of New York, opposite to a certain dwelling-house fronting the street commonly called the Dock street wharf, belonging to him, the said Isaac De Peyster; the said street commonly called Dock street wharf, lying between the said dwelling-house and water lot hereby to be granted, which said water lot hereby to be granted is to extend southerly the whole breadth thereof, so far into the East river or harbor of the said city as the new pier on the east side thereof, belonging to William Milliner, does extend, and is in breadth upon said Dock street thirty-two feet two inches; also in breadth upon the north side of Water street twenty-eight feet two inches, likewise in breadth upon the south side of said Water street twenty-six feet eleven inches, and likewise in breadth upon the East river or harbor of the said city, twenty-one feet two inches, being bounded northerly by the said Dock street (which is to be enlarged and made of the breadth of forty feet) easterly by the water lot granted to Thomas Hunt and Elizabeth Hunt, southerly by the said East river or harbor, and westerly by the water lot granted to Thomas Ellison, as by a survey made of this and sundry other lots by Gerard Bancker, one of the city surveyors, dated the tenth day of November, 1772, and filed in the office of town clerk, reference being had thereto will more fully appear; and also all the estate, right, title and interest which they, the said mayor, aldermen and commonalty of the city of New York, have of, in and to the soil under the water in front of the above-described premises."

The street referred to as Water street is now Front street. Each grant contains this clause, following the description of the premises, omitting the name of the grantee: "And the said * * * (grantee) for himself, his heirs, executors, administrators

and assigns, doth further covenant, promise and grant to and with the said mayor, aldermen and commonalty of the city of New York, and their successors, in manner and form following, that is to say, that the said   *   *   *   , his heirs or assigns, or some one of them, at his and their cost and charges, shall and will build, erect and make, or cause to be built, erected and made a good, sufficient and firm wharf or street of fifteen feet, English measure, in breadth, on the inward part of the water lot hereby granted, contiguous and adjoining to the said commonly called Dock street, to make the said street more spacious and commodious by adding the said fifteen feet thereunto, so as to make the said present street of twenty-five feet of the breadth of forty feet, and that the same shall be built and erected so far in such manner upon a straight or right line as one of the surveyors of the said city for the time being shall instruct and direct; and also shall and will build, erect and make, or cause to be built, erected and made, one other good and sufficient firm wharf or street of forty-five feet, English measure, in breadth, at the distance of one hundred and thirty-nine feet eight inches from the aforesaid street called Dock street, to range with the present street to the eastward thereof, adjoining the basin there lately made called Water street, which said street shall also be built, erected and made in such manner upon a straight or right line as one of the surveyors of the said city shall instruct and direct.   And also shall and will at his and their own proper costs, charges and expense, erect and make, or cause to be built, erected and made, a good, sufficient and firm wharf or street of forty feet, English measure, in breadth, on the outward part of the water lot hereby granted, next to the East river or harbor of the said city, and that the same shall be built, erected and made in such manner upon a straight or right line as one of the surveyors of the said city shall direct, which said three streets of fifteen, forty-five and forty feet, shall be completely made and finished on or before the twenty-sixth day of May, which will be in the year of our Lord 1778; which said several streets shall forever thereafter continue and be for the free and common passage of, and as

public streets and ways for the inhabitants of the said city and all others passing and returning through or by the same, in such manner as the other streets of the same city now are or lawfully ought to be."

The trial court found the following facts among others:

"*Sixth.* That the railway of the defendants, as proposed to be constructed on Front street, will cause no substantial or material impediment to the passage of persons, animals and vehicles in and along the street, and but slight obstruction to the light or air from the street."

"*Thirteenth.* That the title of the plaintiff and of his grantors of his said premises was derived from the grantees under the said grants from the city in some cases by devise, in some by inheritance, and in some by conveyance; and that in all the descriptions the premises are described as bounded in front on Front street.

"*Fourteenth.* That Front street occupies the strip of land which in the said grants is mentioned as Water street, and that prior to the execution of the grants, that street was projected across the lots thereby granted and conveyed.

"*Fifteenth.* That shortly after the execution of the said grants, the water lots therein described were filled in by the grantees or those claiming under or through them; that by them Front street was erected and made, and that presumably, it was erected and made as directed by one of the surveyors of the city.

"*Sixteenth.* That upon plaintiff's said premises is erected a warehouse, occupying the entire front and four stories high; and that since his occupation he has used the same for his office, and for the sale of the merchandise in which he deals.

"*Seventeenth.* That Front street, for the length of the block in front of the plaintiff's said premises, is a street, of the width about forty-five feet; that the street-way between the curbstones is about twenty-four feet wide; that on the southerly side from the curbstone to the building is about eleven feet; that on the northerly side from the curbstone to the

buildings is about ten feet; and that of the space between the curbstone and the buildings about four and one-half feet is used for the stoops and entrances to areas, and the residue for sidewalk.

"*Eighteenth.* That the defendants propose to construct an elevated railroad through Front street, in front of the plaintiff's premises, to extend from the Battery to the Harlem river; that the general mode of construction in Front street consists of a series of columns about fifteen inches square, fourteen and one-half feet high, placed about five inches inside the edge of the sidewalk, and carrying cross-girders, which support four sets of longitudinal girders, upon which are placed cross-ties for three sets of rails for a steam railroad; that the transverse girders are thirty-nine inches deep, the longitudinal girders thirty-three inches deep; that the cars which the defendants propose to run over such railroad will have bodies eleven feet high above the tracks; that the cars in running will project about two feet over the sidewalk on either side of the street; that they will reach to within about nine feet of the plaintiff's premises; and that the defendants propose to run trains as often as once in every three minutes and at rates of speed as high as eighteen or twenty miles an hour.

"*Nineteenth.* That the plaintiff's premises occupy the southeasterly corner of Front and Moore streets, and that the defendants propose to put one of their columns at that corner on the line of Moore street, and inside the curb line.

"*Twentieth.* That the said elevated railroad structure will to some extent obscure the light of the abutting premises opposite to it; that the passing trains will also to some extent obstruct such light, and give to the light a flickering character, which would be to some extent objectionable for business purposes, when an uninterrupted light was necessary, and to some extent impair the general usefulness of plaintiff's premises.

"*Twenty-first.* That the line of columns abridges the sidewalk, and correspondingly interferes with the street, as a thoroughfare, where such columns are located thereon.

" *Twenty-second.* That the fronts of the abutting buildings would be exposed to observation from passengers in the passing trains, and the privacy of those in the second or upper stories of the premises invaded.

" *Twenty-third.* That the structure as proposed in Front street also will fill so much of the carriage-way of the street as is about fifteen feet above the road-way."

Also, that the board of aldermen of the city had, by resolution duly adopted, given its consent for the construction and operation of its road through Front street.

*John E. Parsons* for appellant. No construction should be given to the clause in the deed to Ellison and De Peyster as to streets, which would defeat the grant. (*Duryea* v. *The Mayor, etc.,* 62 N. Y. 592; *Craig* v. *Wells,* 11 id. 315; *Long Island Railroad Co.* v. *Conklin,* 32 Barb. 381; *Starr* v. *Child,* 5 Denio, 599.) The grant is to be liberally construed, so as to carry out the obvious intention of the parties, which was that the title to the bed of the street should pass to the grantee, subject only to the street use. (*Springsteen* v. *Sampson,* 32 N. Y. 703; *Jackson* v. *Dunsbaugh,* 1 Johns. Cas. 92; *Jackson* v. *Meyers,* 3 Johns. 388; *French* v. *Cahart,* 1 Comst. 96; *Holmes* v. *Carley,* 31 N. Y. 289; *Pillow* v. *Bushnell,* 5 Barb. 156; Shepherd's Touchstone, 86; 1 R. S. 748, § 2.) The clause in question constitutes no exception. (*Richardson* v. *Palmer,* 38 N. H. 212; *Hurd* v. *Curtiss,* 7 Metc. 110; *Choate* v. *Burnham,* 7 Pick. 274; *Kannuller* v. *Krotz,* 18 Iowa, 352; *Swick* v. *Sears,* 1 Hill, 17; *Borst* v. *Empie,* 1 Seld. 33; Shepherd's Touchstone, 80, citing Co. 10, 107; Plow. 132; Co. Supr. Litt. 47; id. 79; Peck, § 526; *Minn* v. *Worrall,* 53 N. Y. 44; *Peck* v. *Smith,* 1 Conn. 103; *Leavitt* v. *Towle,* 8 N. H. 96.) The *mesne* conveyances furnish every presumption that it was the intention of the grantors to convey their estate and the description is to be construed according to the apparent intention of the parties. (*Mott* v. *Mott,* 68 N. Y. 246, 253.) Bounding on a street carries to the center line of the street. (*Bissel* v. *The N. Y. Central R. R. Co.,* 23

N. Y. 61; *Perrin v. The N. Y. Central R. R. Co.*, 36 id. 120; *Wallace v. Fee*, 50 id. 694; *Miner v. The Mayor, etc., of New York*, 5 J. & S. 171, 200; *Sizer v. Devereaux*, 16 Barb. 160; *Hammond v. McLachlan*, 1 Sandf. 323; *Lozier v. The N. Y. Central R. R. Co.*, 42 Barb. 465; *Dovaston v. Paine*, 2 Smith's Lead. Cas. [6th Am. ed.] 228; *Banks v. Ogden*, 2 Wall. [U. S.] 57; *Dunham v. Williams*, 37 N. Y. 251.) The dimensions in a description are always controlled by the fixed boundaries. (*Sizer v. Devereux*, 16 Barb. 160; *Jackson v. Ives*, 9 Cow. 661; *Wendell v. Jackson*, 8 Wend. 183; *Northrop v. Swee-ney*, 27 Barb. 196; *Jackson v. Camp*, 1 Cow. 605, 612; *Jackson v. Widger*, 7 id. 723; *Smith v. McAllister*, 14 Barb. 439–40; *Schoonmaker v. Davis*, 44 id. 463.) The words "more or less," in a description indicate that the entire plot is to be conveyed without reference to its exact dimensions. (*Mann v. Pierson*, 2 Johns. 37; *The Morris Canal Co. v. Emmett*, 9 Paige, 169; *Jackson v. Moore*, 6 Cow. 706; *Lash v. Druse*, 4 Wend. 318; *Brady v. Hennion*, 8 Bosw. 528.) The effect of the covenant in the grants of 1773, that Front street was "forever thereafter to continue, and be for the free and common passage of, and as public streets and ways for the inhabitants of said city, and all others passing and returning through or by the same, in such manner as the other streets of said city now are, or lawfully ought to be," was not to vest the title of Front street in the city absolutely upon the ground as decided by Judge ROBINSON, that the city at the time had an absolute title to all the city streets. (*Dunham v. Williams*, 37 N. Y. 251; *Doraston v. Paine*, 2 H. L. C. 527; Colonial Laws, 8; *Washington Cemetery v. Prospect Park & Coney Island R. R. Co.*, 68 N. Y. 591; *In the Matter of John and Cherry Streets*, 19 Wend. 657; *Milhau v. Sharp*, 27 N. Y. 623; *Wetmore v. Law*, 34 Barb. 515, 520; *Mott v. The Mayor, etc.*, 2 Hilt. 358; Laws of 1807, chap. 215, pp. 271, 272, 276; Smith's Lead. Cas. [7th Am. ed.] 142.) The plaintiff, as a mere abutting owner, has an absolute right to protect the street in front of him for or-dinary street uses. (Act of Oct. 9, 1691, Livingston &

Smith, 8; Act of April 16, 1787, 2 Jones & Varick, 152; *Milhau* v. *Sharp*, 27 N. Y. 611; *Davis* v. *The Mayor of New York*, 14 id. 506; *Doolittle* v. *The Supervisors*, 18 id. 155; *Matter of the Petition of The N. Y. Elevated R. R. Co.*, 70 id. 327; *Matter of the Petition of The Gilbert Elevated Railway Co.* v. *Cobbe*, id. 361; *Same* v. *Anderson*, id.; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; *Stone* v. *F. P. N. W. R. R. Co.*, 68 Ill. 298; *Rigney* v. *City of Chicago*, Sup. Ct. of Ill., decided March, 1881; Chicago Legal News of April, 1881; *Haynes* v. *Thomas*, 7 I. & E. [Ind.] 38; *Protzman* v. *I. & E.*, *Ind. Cinn. R. R. Co.*, Ind. 467; *Hooker* v. *New Haven & Northampton R. R. Co.*, 14 Conn. 146; *Glover* v. *Powell*, 2 Stockt. 211; *Lackland* v. *No. Missouri R. R. Co.*, Mo. 180; *Pratt* v. *Brown*, 3 Wis. 613; *Gardner* v. *Trustees of Newbergh*, 2 Johns. Ch. 162; *Lansing* v. *Smith*, 8 Cow. 146; *Canal Appraisers* v. *People*, 17 Wend. 570; *Fletcher* v. *Auburn & Syracuse R. R. Co.*, 25 id. 462; *The Rochester White Lead Co.* v. *The City of Rochester*, 3 N. Y. 463; *Boughton* v. *Carter*, 18 Johns. 405; *Brown* v. *Cayuga & Susquehanna R. R. Co.*, 12 N. Y. 486; *Bellinger* v. *New York Central R. R. Co.*, 23 id. 42; *Arnold* v. *The Hudson River R. R. Co.*, 55 id. 661; *Matter of Flatbush Ave.*, 1 Barb. 286; *Seneca Road Co.* v. *Auburn & Rochester R. R. Co.*, 5 Hill, 170; *First Baptist Church* v. *Schenectady & Troy R. R. Co.*, 5 Barb. 79; *Drake* v. *New York Central R. R. Co.*, 7 id. 508; *Moses Taylor* v. *Brookman*, 45 id. 106; *Matter of Utica, Chenango & Susquehanna Valley R. R. Co.*, 56 id. 456; *Trustees Presbyterian Society* v. *Auburn & Rochester R. R. Co.*, 3 Hill, 568; *Mahon* v. *New York Central R. R. Co.*, 24 N. Y. 658; *Wagner* v. *Troy R. R. Co.*, 25 id. 526; *Craig* v. *Rochester & C. R. R. Co.*, 39 id. 404; *Gould* v. *Hudson River R. R. Co.*, 6 id. 522; *People* v. *Canal Appraisers*, 35 id. 461.) The interest of the abutting owner, his right to light and air and ventilation and freedom of access, his exemption from annoyance, is property, and it can only be taken from him by legal process and for just compensation. (*Taylor* v. *Porter*, 4 Hill, 140; *Wynehamer Case*, 13 N. Y.

378; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; 3 Kent's Com. 452; Termes de Ley, Easement; 2 Washb. Real Prop. 302, 307; *Beach* v. *Childs*, 13 Wend. 343; 22 id. 528.) Whether the plaintiff is owner in fee of the bed of Front street, or is limited to the ordinary right of an abutting owner, the construction and maintenance of the defendant's railroad in imposing a new burden or servitude upon the street violates the plaintiff's rights. (*Williams* v. *New York Central R. R. Co.*, 16 N. Y. 97; *Craig* v. *Rochester & Brighton R. R. Co.*, 39 id. 404; *Strong* v. *The City of Brooklyn*, 68 id. 1.; *Washington Cemetery* v. *P. P. & C. I. R. R. Co.*, id. 591.) The interest of the owner must be condemned by judicial proceedings and paid for before his property can be taken. (*Taylor* v. *Porter*, 4 Hill, 140; *Williams* v. *The New York Central R. R. Co.*, 16 N. Y. 97; *Wager* v. *Troy Union R. R. Co.*, 25 id. 526, 530; *The Ellicottville & Gt. Valley Plankroad Co.* v. *The Buffalo & Pittsburgh R. R. Co.*, 20 Barb. 644; *Fletcher* v. *The Auburn & Syracuse R. R. Co.*, 25 Wend. 462; *The Trustees, etc.*, v. *Auburn & Rochester R. R. Co.*, 3 Hill, 567; Laws of 1850, chap. 140, § 18.) Injunction is the proper remedy to protect the owner's rights. (*Williams* v. *The N. Y. Cent. R. R. Co.*, 16 N. Y. 97; *Davis* v. *The Mayor, etc., of N. Y.*, 14 id. 506, 525, 526; *Milhau* v. *Sharp*, 27 id. 624; *Craig* v. *Rochester, etc., R. R. Co.*, 39 id. 404; *Bloomfield Gas-light Co.* v. *Calkins*, 62 id. 386.) The Court of Common Pleas had jurisdiction and could grant relief by injunction. (Laws of 1867, chap. 489; Laws of 1873, chap. 239; Laws of 1875, chap. 606.) No extra allowance could be granted in this case. (*Atlantic Dock Co.* v. *Libby*, 45 N. Y. 499.) The property rights of the abutting owners in the streets are within the provisions of the General Railroad Act as to acquiring real estate by hostile proceedings. (*In the Matter of the Petition of the N. Y. Elevated R. R. Co.*, 70 N.Y. 327; *In the Matter of the Gilbert Elevated R. R. Co.*, id. 361; *In the Same Matter* v. *Anderson*, id.) The presumption applicable to city streets equally as to country roads is that the adjoining owner is seized to the center line.

(*Bissell* v. *N. Y. Cent. R. R. Co.*, 23 N. Y. 61; *Embury* v. *Conner*, 3 id. 500; *Rensselaer & S. R. R. Co.* v. *Davis*, 43 id. 137; *In the Matter of Albany St.*, 11 Wend. 148; *Bloodgood* v. *M. & H. R. R. Co.*, 18 id. 9; *In the Matter of John and Cherry Sts.*, 19 id. 659; *Sixth Ave. R. Co.* v. *Gilbert Elevated R. R. Co.*, 11 J. & S. 392; *Hooker* v. *Utica & Minden Turnpike Road Co.*, 12 Wend. 371; *Jackson* v. *Hathaway*, 15 Johns. 447; *Sherman* v. *McKeon*, 38 N. Y. 266.) The case is quite different from that of land acquired for a hospital. (*Hayward* v. *The Mayor*, 3 Seld. 314.)

*Wm. M. Evarts* for appellant. The Elevated Railroad Act requires compensation to be paid by it for all private property taken for its purposes. (*Matter of N. Y. El. R. R. Co.*, 79 N. Y. 327; *Matter of Gilbert El. R. R. Co.*, id. 361.) The property right in a street of the abutting proprietor is precisely the same, whether he also owns the fee of the street, and the public or the municipality cover it with a public easement or with a public trust, or whether the fee goes to support the same public easement and the same public trust. (*Railroad Co.* v. *Schurmeier*, 7 Wall. 272, 273; *Transportation Company* v. *Chicago*, 99 U. S. 635, 641.) By the law of 1813 what the public takes and what the private owner is deprived of is one and the same thing. And as the private owner had the whole fee-simple absolute, legal and beneficial before the public took any thing from that fee he retains the entire beneficial interest not thus parted with. (2 R. S. 414; 2 Wend. 474; *Matter of Seventeenth Street*, 1 id. 262.) The interests of abutting proprietors in the maintenance of an open street in front of their lots as secured and paid for under the act of 1813 are property in the sense of our law, and if so, not to be taken away, in whole or in part for public use without compensation. (Code of Civil Proc., §§ 162, 163, 164, 165, 166, 245, 247; *Arnold* v. *Hudson R. R. S. Co.*, 55 N. Y. 661.) The occupation of the streets by the structure and traffic of the defendant is not within the public easement acquired under the act of 1813, and is subversive of the abutting proprietor's easement and beneficial estate,

secured and paid for under that act. (16 N. Y. 109, 110.) A permanent structure above the street surface, and an encroachment thereby and by its use upon the appurtenant easement of the open frontage held by the abutting proprietors was not covered by the original condemnation for the public easement which was limited to a maintenance of such open streets and perpetual frontage. (*People* v. *Kerr*, 27 N. Y. 188; *Craig* v. *Rochester R. R. Co.*, 39 id. 404.)

*Joseph H. Choate* for property owners. The abutting owners on the streets have an interest in the nature of property for all time in the streets above their surface and in having them kept open and unobstructed, forever, of which they cannot be deprived without being compensated. (*Hayward* v. *The Mayor, etc.*, 3 Seld. 314; *Livingston* v. *The Mayor, etc.*, 8 Wend. 85, 99; *People* v. *Kerr*, 27 N. Y. 188; *In re B. & A. Co.*, 50 id.)

*Julien T. Davies* and *Roger Foster* for Caso and others. The authorization by the legislature of the acts of the defendant without providing for any compensation to the plaintiff would be a law impairing the obligation of contracts, and, therefore, an infringement of the Constitution of the United States. (Const. of the U. S., art. 1, § 10; *Fletcher* v. *Peck*, 6 Cranch, 136; *Terrett* v. *Taylor*, 9 id. 43; *Dartmouth College* v. *Woodman*, 4 Wheat. 518; *Wabash R. R. Co.* v. *Beers*, 2 Black. 448. See brief of Messrs. Porter and Stone in *Caso* v. *Metropolitan El. Ry. Co of New York*, Supr. Ct. 138; *Scott* v. *Becker*, 4 Price, 346; *Smith* v. *Swormstedt*, 16 How. [U. S.] 288; *Florida Central R. R. Co.* v. *Schults*, 103 U. S. 118, 140; *People* v. *New York Cent. R. R. Co.*, 13 N. Y. 78, 80; *Knight* v. *Knight*, 3 Beav. 193; *Carry* v. *Carry*, 2 Sch. & Lef. 189; *Warner* v. *Bates*, 98 Mass. 274; Bispham's Eq., §§ 71, 74; *Livingston* v. *The Mayor*, 8 Wend. 85, 99; *Drake* v. *Hudson River R. R. Co.*, 7 Barb. 508, 535; *Imlay* v. *Union Branch R. R. Co.*, 26 Conn. 255.) Even if the language in the conveyance to the plaintiff's predecessor

did not create an express trust for the benefit of the abutting owners; upon the sale of this land to the city, bounded upon a street, they took by implication an easement given them and their successors a right of way and to an uninterrupted passage of light and air over it to their abutting building land. (*In re Seventeenth Street*, 1 Wend. 262; *In re Lewis Street*, 2 id. 472; *Livingston* v. *Mayor*, 8 id. 85; *Smyles* v. *Hastings*, 22 N. Y. 217; *Fonda* v. *Borst*, 2 Keyes, 48; *Cox* v. *James*, 45 N. Y. 557; *Badeau* v. *Mead*, 14 Barb. 328; *Livingston* v. *Mayor of New York*, 8 Wend. 85, 98, 99; *Lampman* v. *Mills*, 21 N. Y. 505, 511, 512, 513; *Cox* v. *Matthews*, Ventris, 237; *Palmer* v. *Fletcher*, 1 Lev. 122; 1 Sid. [S. C.] 167; *Tremain* v. *Cohoes Co.*, 2 N. Y. 163, 164; *McCready* v. *Thompson*, 1 Dudley [S. C.], 131; *Robeson* v. *Pittenger*, 1 Green's Ch. [N. J.] 57; *Durel* v. *Boisblanc*, 1 La. Ann. 407; *Gerber* v. *Grabel*, 16 Ill. 217; L. 2, § 12, D. 438; *Lawrence* v. *R'y Co.*, 16 Ad. & El. [N. S.] 643; *In re Prospect Park and Coney Island R. R. Co.*, 16 Hun [23 S. C.], 261; *Furniss* v. *R. R. Co.*, 5 Sandf. 551, at page 556; *Reg.* v. *Bradford Navigation Co.*, 34 L. J. Q. B. 191; *Washington Cemetery* v. *Prospect Park and Coney Island R. R. Co.*, 68 N. Y. 591; 7 Hun [14 S. C.], 655; *Bostwick* v. *North Staffordshire R'y Co.*, 3 Smale & Giffard, 283; *Kennedy* v. *Indianapolis*, 103 U. S. 599; *Lawrence* v. *R'y Co.*, 16 Ad. & Ell. [N. S.] 643, at page 652; *In re Prospect Park and Coney Island R. R. Co.*, 16 Hun,° 261; *Livingston* v. *The Mayor*, 8 Wend. 85.) Such a trust estate and easement is appurtenant to the ownership of the lands abutting upon the street, and passes to all purchasers of them without any expressed words conveying it. (*Haynes* v. *Thomas*, 7 Ind. 38; *Protzman* v. *Indianapolis & Cincinnati R. R. Co.*, 9 id. 469; Cooley's Const. Lim. 679; *In Trustees of Columbia College* v. *Thatcher*, N. Y. Ct. App., January 17, 1882; 13 Reporter, 248; *People* v. *Kerr*, 27 N. Y. 188, 204, 205; *People* v. *Kerr*, 37 Barb. 357, 401; *Kellinger* v. *Forty-second Street R. R. Co.*, 50 N. Y. 206, 212; *Hinchman* v. *Patterson Horse R. R. Co.*, 2 C. E. Green [N. J.], 76.) Independent of any

contract or statutory clause giving the plaintiff a trust estate or an easement in the street, on which his house and land abut, a law authorizing the invasion of his premises by the noise, smell, steam, smoke and dust from, and the obstruction of the necessary means of access to them caused by the defendant's road, without compensation to him for the injury thereby occasioned, would take his private property for public use without compensation and therefore be an infringement of the Constitution of the State of New York. (Const. of the State of New York, art. 1, § 6 ; *Cancemi* v. *People,* 18 N. Y. 128 ; *Homer* v. *Graves,* 7 Bing. 743 ; *Hooker* v. *Vandewater,* 4 Denio, 349 ; *Saratoga County Bank* v. *King,* 44 N. Y. 87 ; 2 Austin's Juris. 818 ; *Wynehamer* v. *People,* 13 N. Y. 378, 398, 416 ; *Ervine's Appeal,* 16 Penn. St. 256 ; Post's Gaines, II, §§ 1–14, pp. 164, 165 ; Puchta Pandekten, § 14, 145 ; Puchta II, 307 and cf. p. 578 ; Roder II, 239 ; Windscheid Pandekten 1, § 167 ; Ahrens Couss II, 117 ; Mirabeau Histoire Parlementaire, liv. XXVI, chap. 15 ; Holland's Juris., chap. XI, 134 ; Amo's Science of Juris. 4 ; Sir G. C. Lewis' Use and Abuse of Political Terms, 170 ; 2 Austin's Juris. Vol. II, 965, B. (a) ; Austin's Juris. VII, 817, 818 ; Holland's Juris. 134 ; Bl. Com. 138 ; Civil Code of the State of Louisiana, art. 480 ; Mills on Eminent Domain, § 31 ; *Sherman* v. *Elder,* 24 N. Y. 381, 384, 385 ; *Bertholf* v. *O'Reilly,* 74 id. 509, 515 ; *Jackson* v. *Housal,* 17 Johns. 281, 283 ; *People* v. *Haines,* 49 N. Y. 587, 590 ; *San Manteo Water-Works Co.* v. *Sharpstein,* 50 Cal. 284 ; *St. Peter* v. *Dennison,* 58 N. Y. 416 ; *White* v. *White,* 5 Barb. 474 ; *Westervelt* v. *Gregg,* 12 N. Y. 202 ; *Erwin* v. *United States,* 97 U. S. 392 ; *In re William and Anthony Streets,* 19 Wend. 678 ; *Astor* v. *Hoyt,* 5 id. 603 ; *West River Bridge Co.* v. *Dix,* 6 How. [U. S.] 507 ; *Richmond* v. *R. R. Co.,* 13 id. 71 ; *State* v. *Noyes,* 47 Me. 189 ; *The Troy & Boston R. R. Co.* v. *Northern Turnpike Company,* 16 Barb. 100 ; *Morgan* v. *King,* 35 N. Y. 454 ; *Arnold* v. *Hudson River R. R. Co.,* 55 id. 661 ; Bl. Com. 20, 44.) The owner of land and buildings has the capacity of restraining another from injuring his enjoyment of it by smells, smoke, dust, offensive gases, excessive

noise and obstruction to his entrance thereto; even though these damages result from acts committed by the defendant beyond the land of the plaintiff. (*Mosley* v. *Pragnell*, Cro. Car. 510; *Fish* v. *Dodge*, 4 Denio, 311; *Morris* v. *Brower*, Anthon's N. P. 368; *Carhart* v. *Auburn Gas-light Company*, 22 Barb. 297; *Attorney-General* v. *Metropolitan Gas-light Company*, Daily Register, February 10, 1882; *Crump* v. *Lambert*, L. R., 3 Eq. 409; *Attorney-General* v. *Metropolitan Ry. Co.*, Daily Register, February 10, 1882; *Attorney-General* v. *Metropolitan Ry. Co.*, L. R., Daily Register, February 10, 1882; *Hutchins* v. *Smith*, 63 Barb. 251; *Conklin* v. *Phœnix Mills*, 62 id. 299; *Fish* v. *Dodge*, 4 Denio, 311; *Drake* v. *Hudson River R. R. Co.*, 7 Barb. 508; *Crump* v. *Lambert*, L. R., 3 Eq. 409; *Carhart* v. *Auburn Gas-light Co.*, 22 Barb. 297; *Bradley* v. *Gill*, Lutworth, 69; *Soltau* v. *De Held*, 2 Simons [N. S.], 133; *Fish* v. *Dodge*, 4 Denio, 311; *Walker* v. *Brewster*, L. R., 5 Eq. Cas. 25; *Dargan* v. *Waddell*, 9 Ired. 244; *Brill* v. *Flagler*, 23 Wend. 354; *McKeon* v. *See*, Robertson [1 N. Y. Supr. Ct.], Ct.], 449; *Green* v. *London General Omnibus Co.*, 7 C. B. [N. S.] 290; *Milarkey* v. *Foster*, 6 Oreg. 378; *S. C.*, 25 Am. Rep. 531, and note at page 533; *Dennis* v. *Sipperly*, 17 Hun [24 S. C.], 69; *Moore* v. *Jackson*, 2 Abb. [N. S.] 212; *Pacific R. R. Co.* v. *Andrews*, 27 Kansas; *S. C.*, 25 Alb. L. J. 357; *Lackland* v. *North Missouri R. R. Co.*, 21 Mo. 180, 187, 188; *Beckett* v. *The Midland R. Co.*, L. R., 3 C. P. 82; *Chamberlain* v. *R. R. Co.*, 2 B. & S. 605; *Carli* v. *Stillwater Street Ry. Trans. Co.*, 25 Ab. L. J. 156; *Western Penn. R. R. Co.* v. *Hill*, 6 P. F. Smith [Penn.], 460; *Eaton* v. *B. C. & M. R. R. Co.*, 51 N. H. 504, 511, 512; *Gardner* v. *Trustees of Newburgh*, 2 Johns. Ch. 162, 159; *Hay* v. *Cohoes Co.*, 2 N. Y. 159; *Tremain* v. *Cohoes Co.*, id. 163; *St. Peter* v. *Dennison*, 58 id. 416; *Duncan* v. *Findlater*, 6 Clark & Finnelly, 908; *London & North-western Ry. Co.* v. *Bradley*, 3 Mac. & G. 341; *Caledonian Ry. Co.* v. *Ogilvy*, 2 Macq. Sc. App. 246; *Boulton* v. *Crowther*, 2 B. & C. 706; *Whitehouse* v. *Birmingham Canal Co.*, 27 L. J. Exch. 25; Dr. Lome Constitution, p. 134; Institutes by Coke, 36; 1 Bl. Com. 160; *Brown* v. *Cayuga & Susquehanna R. R. Co.*, 12

N. Y. 486 ; Cooley's Const. Lim. [1st ed.] 3, 4 ; De Tocque-
ville's Democracy in America, Reeve's Translation [2d Am.
ed.], 80 ; 1 Bl. Com. 161 ; 4 Coke's Inst. 36 ; Cooley's Const.
Lim. [1st ed.] 45, 46 ; *Crawford* v. *The Village of Dela-
ware*, 7 Ohio St. 459, at pp. 466, 747; *Bloodgood* v. *Mo-
hawk & Hudson R. R. Co.*, 18 Wend. 9, 29, 31 ; *Barron*
v. *Mayor of Baltimore*, 2 Amer. Jurist. 210; *Goodall* v.
*City of Milwaukee*, 5 Wis. 32, at pp. 38, 45 ; Cooley's
Const. Lim. [1st ed.] 85 ; Ang. on Water-Courses [6th
ed.], § 461 ; *People* v. *Kerr*, 37 Barb. 357, 412, 415 ;
American Law Mag. No. 1, April, 1843, 58–60 ; *Bunn* v.
*The People*, 45 Ill. 397, at p. 419 ; Sedg. on Dam. [5th ed.]
121, 122 ; Sedg. on Stat. and Const. Law, 523, 524, note ;
*Buffalo B. B. & C. R. R. Co.* v. *Ferris*, 26 Texas, 588, at p.
602 ; 1st Am. Law Mag. 64 ; *Eaton* v. *B. O. & M. R. R.*, 5
N. H. 504, at pp. 515 to 518 ; *Stone* v. *F. P. & N. W. R.
R. Co.*, 68 Ill. 394, at p. 396.) If the word "property" be taken
in its most restricted, what Austin calls its "loose and vulgar,"
sense as signifying a physical object which must be physically
invaded in order to constitute a taking of it, the acts of the
defendant constitute such a taking. (*Wynehamer* v. *The
People*, 13 N. Y. 378, at p. 379 ; *The People* v. *Kerr*, 37
Barb. 357, at p. 399 ; Co. Litt. 4 b ; *Eaton* v. *B. C. & M. R.
R.*, 5 N. H. 504, 512, 513 ; Wood's Law on Nuisance, ——;
*Pumpelly* v. *Green Bay Company*, 13 Wall. 166, 177, 178, 181 ;
*People* v. *Haines*, 49 N. Y. 587, 506 ; *Hay* v. *Cohoes Com-
pany*, 2 id. 159, 162, 163 ; *Eaton* v. *Boston, Concord and
Montreal R. R. Co.*, 51 N. H. 504; *S. C.*, 12 Am. Rep. 153 ;
*Hooker* v. *New Haven and Northampton R. R. Co.*, 14 Conn.
146 ; *Pratt* v. *Brown*, 3 Wis. 305 ; *Rochester White Lead Co.*
v. *City of Rochester*, 3 N. Y. 463 ; *People* v. *Haines*, 49 id.
587 ; *People* v. *Nearing*, 27 id. 306 ; *Bellinger* v. *New York
Central R. R. Co.*, 23 id. 42; *Hay* v. *Cohoes Company*, 2
id. 162; *Tremain* v. *Cohoes Company*, id. 163; *St. Peter* v.
*Dennison*, 58 id. 416 ; *East* v. *Schollenberger*, 54 Penn. St.
144; *Gourdier* v. *Cormack*, 3 E. D. Smith, 200 ; *Hardrop* v.
*Gallagher*, 2 id. 523 ; *Tremain* v. *Cohoes Co.*, 2 N. Y. 163 ;

*Pixley* v. *Clark*, 33 id. 520; *Brand* v. *H. & C. Ry. Co.*, L. R., Q. B. 223.) The plaintiff's property is taken by the defendant, because its structure cuts off from his land the sunlight which was accustomed to shine upon it. (*Gardiner* v. *Trustee of Newburgh*, 2 Johns. Ch. 162; *Gates* v. *Milwaukee*, 10 Wall. 497; *The Bank* v. *Roberts*, 44 N. Y. 192; *Arnold* v. *Railroad Company*, 55 id. 661; *Eagle* v. *Charing Cross Railway Company*, L. R., 2 C. P. 638.) The plaintiff's property is taken from him by the diminution of the enjoyment of his house and land caused by the noise, smells and darkness resulting from the operation of the defendant's road. (Schouler on Personal Property, Introductory, p. 4; Mills on Eminent Domain, § 31.) A statute authorizing the injury done to the plaintiff's house and land by the smoke, smell, noise, darkness and obstruction to his right of way, resulting from the construction and operation of the elevated railroad without providing for compensation, would deprive him of his property without due process of law, and therefore be an infringement of the Constitution of both the United States and the State of New York. (Amendment XIV to the Constitution of the United States; Art. 1, § 6, of the Constitution of the State of New York; Story on Const. [4th ed.], § 1956.) It must be presumed, if the construction of the statute were doubtful, that the legislature which passed it intended to obey the fundamental law. (*People* v. *Supervisors of Orange*, 17 N. Y. 241; *Newland* v. *Marsh*, 19 Ill. 384; *Bigelow* v. *West Wisconsin Railroad Company*, 27 Wis. 478; *Attorney-General* v. *Eau Claire*, 37 id: 400; *Dow* v. *Norris*, 4 N. Y. 17; Cooley's Const. Lim. 223–225, marginal pages 184–186.) Authority given by similar statutes is always strictly construed in favor and protection of private rights. (*Powell* v. *Tuttle*, 3 N. Y. 396, at page 401; *In the Matter of Boston & Albany Railroad Company*, 53 id. 574, at page 579; *Washington Cemetery* v. *Coney Island Railroad Company*, 68 id. 591; *The Brooklyn Park Commissioners* v. *Armstrong*, 45 id. 239; *Brown* v. *Railroad Company*, 12 id. 491.) The Rapid Transit Acts make ample provision for the compensation of

all who would under them be deprived of any rights. (*Matter of New York Elevated R. R. Co.*, 70 N. Y. 327, 354, 355; *Caro* v. *Metropolitan El. Ry. Co.*, 46 N. Y. Supr. [14 J. & S.] 138; *Rigney* v. *City of Chicago*, 13 Chi. Leg. News, 226.) The proper remedy for the plaintiff is an injunction. (*Gardiner* v. *Trustees of Newburgh*, 29 Ch. 162; *Henderson* v. *Mayor, etc., of New Orleans*, 5 Miller's La. 416; *Thompson* v. *Grand Gulf Railroad and Banking Company*, 3 How. [Miss.] 240; *Davis* v. *Mayor of New York*, 14 N. Y. 506, at pp. 525 and 526; *Williams* v. *New York Central Railroad Co.*, 16 id. 97; *Milhau* v. *Sharp*, 27 id. 624; *Craig* v. *Rochester, etc., Railroad Company*, 39 id. 404; 2 Kent's Com. 339 and note [b]; *Bostock* v. *North Staffordshire Ry. Co.*, 3 Smale & Giffard, 283; *Kentucky* v. *Indianapolis*, 103 U. S. 599; *Pacific Sy. Co.* v. *Andrews*, 27 Kans. S. C., 25 Alb. L. J. 357; *Osburne* v. *Carton & Goddins*, Anno. 26; Elizabeth Choyce's Cases in Chancery, 176, reprint of 1870; *St. Helen's Smelting Works* v. *Tipping*, 11 H. L. C. 642; *Parker* v. *Winnipiseogee*, 2 Black [U. S.], 545; *Mayor of New York* v. *Baumberger*, 7 Robertson [N. Y.], 219; *Hudson River R. R. Co.* v. *Loeb*, id. 418; *Mulligan* v. *Elias*, 12 Abbott [N. S.], 259; *Henderson* v. *New York Central R. R. Co.*, 78 N. Y. 423; *Musselman* v. *Marquis*, 1 Bush [Ky.], 463; *Hicks* v. *Compton*, 18 Cal. 206; *Gause* v. *Perkins*, 3 Jones' Eq. 177; Bispham's Eq., § 436; *Tiyping* v. *Eckersley*, 2 K. & J. 270; *Lord Manners* v. *Johnson*, L. R., 1 Ch. D. 673; *Lloyd* v. *London, Chatham & Dover Ry. Co.*, 2 D. J. & S. 568; *Trustees of Columbia College* v. *Lynch*, 70 N. Y. 440.)

*David Dudley Field* for respondent. The title to the street does not rest in the plaintiff, for the reason that the *mesne* conveyances do not transfer it to him. (*Webber* v. *The Eastern R. R. Co.*, 2 Metc. 150; *English* v. *Brennan*, 60 N. Y. 609.) According to the Dutch law the fee of all streets and roads vested in the municipality or the State. (*Dunham* v. *Williams*, 37 N. Y. 251; *Bartow* v. *Draper*, 5 Duer, 130, 140; *Whitney* v. *The Mayor* 1 Hoffman on the Rights of the Corpora-

tion, 199; *Furman* v. *The Mayor*, 5 Sandf. 16; 6 Seld. 508; *Kellinger* v. *Forty-second St. R. R.* 50 N. Y. 206.)   The clauses in the deed relating to the streets amount to a reservation of the streets from the operating clause of the granting part. (*Marshall* v. *Guion*, 11 N. Y. 461; 1 E. D. Smith, 294.)   Defendant cannot now be made responsible in damages for such depreciation of the plaintiff's property, or such disturbance of his enjoyment of it, as is foretold in the complaint. (*Lansing* v. *Smith*, 4 Wend. 21; 8 Cow. 148, 167; *Radcliff's Exrs.* v. *The Mayor*, etc., *of Brooklyn*, 4 N. Y. 195; *Gould* v. *Hudson R. R. R. Co.*, 6 id. 522; *Williams* v. *N. Y. C. R. R. Co.*, 16 id. 97; 18 Barb. 240; 16 N. Y. 101; Haffman's Treatise, 289; *Bellinger* v. *N. Y. C. R. R. Co.*, 23 N. Y. 42, 48. *Radcliff's Exrs.* v. *The Mayor*, etc., *of Brooklyn*, 4 Comst. 195; 99 U. S. 635.)   The legislature has duly authorized, and the city has consented to the construction and operation of the defendant's railway. (Laws of 1875, chap. 606; *Matter of N. Y. El. Ry. Co.*, 70 N. Y. 327; *Matter of Gilbert El. Ry. Co.*, id. 361.)   The taking of property referred to in sections 6 and 7 of article 1 of the Constitution is the taking of it into possession. (*Eaton* v. *R. R. Co.*, 51 N. H. 504; *Transp. Co.* v. *Chicago*, 99 U. S. 642; Cooley on Const. Lim. 542 and notes; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166.) Defendant cannot be made answerable for consequential damages, suffered after the establishment of the railway. (*Brooklyn Park Case*, 45 N. Y. 235; *Ninth Avenue Case*, id. 732.)

DANFORTH, J.   The plaintiff is the owner of land situated on the corner of Moore and Front streets in the city of New York, on which he or his grantors erected buildings.   To their enjoyment, light, air and access are indispensable, and are had through Front street.   The complaint states that the defendant is about to construct a railroad above the surface of that street, in such manner as will obstruct access to the buildings, and deprive the plaintiff of the benefit of light and air.   The trial court has in substance found these matters in favor of the plaintiff, and among other things leading to that result, that

the defendant intends to construct such road upon a series of columns, about fifteen inches square, fourteen feet and six inches high, placed five inches inside the edge of the sidewalk and carrying girders from thirty-three to thirty-nine inches deep, for the support of cross ties for three sets of rails for a steam railroad. The cars intended for this road will, when placed thereon, have bodies eleven feet high above the tracks, in running will project two feet over the sidewalk on either side of the street, and will reach within nine feet of the plaintiff's buildings. The defendant intends to run its trains as often as once in three minutes, and at a rate of speed as high as eighteen miles an hour.

The learned court found that this construction would, "to some extent, obscure the light of the abutting premises; that the passing trains will also do this, and give to the light a flickering character objectionable for business purposes" "and to some extent impair the general usefulness of the plaintiff's premises;" "that the line of columns abridges the sidewalk, and interferes with the street as a thoroughfare, where such columns are located;" that the structure "will fill so much of the carriage-way of the street as is more than fifteen feet above the road-way;" "that the fronts of the abutting buildings will be exposed to observation from passengers in the passing trains, and the privacy of those in the second or upper stories of the premises invaded." It is also found, that these things will be "of a constant and continuing character," and will "tend to the occasioning of incidental damages to the plaintiff's premises and depreciation of its value;" but also finds the acts of the defendants producing these results would be lawful, and that the plaintiff has no cause of action. This conclusion rests upon the further finding that the mayor, aldermen and commonalty of the city of New York are the owners in fee of Front street, opposite the plaintiff's lots, and that he is not, and never has been seized of the same in fee, nor had any estate or interest therein. The complaint was, therefore, dismissed, and an order made giving to the defendant an extra allowance of costs. From this order and

from the judgment of dismissal the plaintiff appealed to the General Term, where both judgment and order were affirmed.

Although this statement is somewhat extended, it is evident that the essential facts of the case are within a narrow compass, and it will be found, I think, that the material legal question, however difficult to answer, is simple in its terms, and leads at once to the inquiry whether the scheme of the defendant involves the taking of any property of the plaintiff. If it does, the judgment in its favor is erroneous upon the substantial ground that the intended act, when performed, would violate not only the provision of the Constitution, which declares that such property shall not be taken without just compensation (Art. 1, § 6), but the statutes by which the defendant is bound (Laws of 1875, chap. 606; act of 1850, chap. 140; act of 1866, chap. 697; act of 1867, chap. 489), or to which they owe their existence (Laws of 1867, chap. 489; Laws of 1875, chap. 606), and whose validity would not have been upheld, unless, in the opinion of this court, they provided means to secure such compensation. (*In re Petition of Gilbert Elevated R. Co., to acquire land in the city of New York*, respondent, v. *Kobbe*, appellant, 70 N. Y. 361; *In re Petition New York Elevated R. R.*, id. 327.)

The plaintiff contends, first, that as the owner of the abutting premises he has the fee of one-half the bed of the street opposite thereto and through which the proposed road is to be built; second, if the fee of the street is in the city, he, as abutting owner, has such right to air and light and access afforded by the street above the road-bed as entitles him to protect it and have it kept open for those uses, until by legal process and upon just compensation that right is taken from him.

In the first place I propose to discuss the second ground as of greater general importance than the other, and equally sufficient, if found in the plaintiff's favor, to sustain his case. It assumes that the fee of the streets is in the city of New York. The defendant justifies its intended acts through permission of that city. It is not material to inquire in what manner the city acquired its title, for the plaintiff's interest or title, what-

ever it is, was derived from it.  His lots and the street in question are parts of a larger tract, which, prior to May, 1773, the city caused one of its engineers to survey and lay out into streets and lots, and designate upon a map.

By deeds dated respectively in May and in December of that year, they conveyed the lots in question to the grantees named therein, by metes and bounds..  The street already referred to as Front street is marked out upon the map under the name of Water street, and if the description of the premises conveyed does not include its bed — as I am now assuming that it does not — it at least brings it to the street and causes it to adjoin or front upon it.   The lots and the street are upon the map, and in the deed are described as being upon the " side of Water " (now Front) street, so many feet and inches, " as by the survey made of this and sundry other lots by Gerard Bancker, one of the city surveyors, dated the tenth day of November, 1772, and filed in the office of the town clerk, will more fully appear, with the appurtenances thereto belonging or appertaining."

The deeds contain a covenant on the part of the grantee, " to build and erect," at his own expense, certain streets, and among others, the one now in question, " which said several streets " (it declares) " shall forever thereafter continue and be for the free and common passage of, and as public streets and ways for the inhabitants of the said city, and all others passing and returning through or by the same, in like manner as the other streets of the same city now are, or lawfully ought to be." The trial court finds that Front street occupies the strip of land which in those grants is mentioned as Water street ; that prior to their execution that street was projected across the lots thereby granted and conveyed, and that shortly after their execution, the street referred to was established and made by the grantees.   The conveyance to the plaintiff describes the lot in question as " bounded northerly in front by Front street aforesaid," and the trial court finds that upon the same " is erected a warehouse occupying the entire front, and four stories high."

It is not necessary to consider the effect of the circumstances

I have now adverted to, upon the rights of the public in the street in question. It is conceded to be a public street. But besides the right of passage, which the grantee, as one of the public, acquired, he gained certain other rights as purchaser of the lot, and became entitled to all the advantages which attached to it. The official survey — its filing in a public office — the conveyance by deed referring to that survey and containing a covenant for the construction of the street and its maintenance, make as to him and the lot purchased a dedication of it to the use for which it was constructed. The value of the lot was enhanced thereby, and it is to be presumed that the grantee paid, and the grantor received an enlarged price by reason of this added value. There was thus secured to the plaintiff the right and privilege of having the street forever kept open as such. For that purpose, no special or express grant was necessary; the dedication, the sale in reference to it, the conveyance of the abutting lot with its appurtenances, and the consideration paid were of themselves sufficient. (*Wyman* v. *Mayor of N Y.*, 11 Wend. 487; *Trustees of Watertown* v. *Cowen*, 4 Paige, 510). The right thus secured was an incorporeal hereditament; it became at once appurtenant to the lot, and formed " an integral part of the estate " in it. It follows the estate and constitutes a perpetual incumbrance upon the land burdened with it. From the moment it attached, the lot became the dominant, and the open way or street the servient tenement. (*Child* v. *Chappell*, 9 N. Y. 246; *Hills* v. *Miller*, 3 Paige, 256; *Trustees of Watertown* v. *Cowen*, 4 id. 514.)

Nor does it matter that the acts constituting such dedication are those of a municipality. The State even, under similar circumstances, would be bound, and so it was held in the *City of Oswego* v. *Oswego Canal Co.* (6 N. Y. 257). " In laying out the village plot," say the court, and in selling the buildings lots, the State acted as the owner and proprietor of the land; and the effect of the survey and sale in reference to the streets laid down on the map, was the same as if the the survey and sale had been made by a single individual." Lesser corporations can claim no other immunity, and all are bound upon the

principle that to retract the promise implied by such conduct, and upon which the purchaser acted, would disappoint his just expectations. (*Child* v. *Chappell, supra.*)

But what is the extent of this easement? what rights or privileges are secured thereby? Generally, it may be said, it is to have the street kept open, so that from it access may be had to the lot, and light and air furnished across the open way. The street occupies the surface and to its uses the rights of the adjacent lots are subordinate, but above the surface there can be no lawful obstruction to the access of light and air, to the detriment of the abutting owner. To hold otherwise would enable the city to derogate from its own grant, and violate the arrangement on the faith of which the lot was purchased. This in effect was an agreement, that if the grantee would buy the lot abutting on the street, he might have the use of light and air over the open space designated as a street. In this case it is found by the trial court, in substance, that the structure proposed by the defendant, and intended for the street opposite the plaintiff's premises, would cause an actual diminution of light, depreciate the value of the plaintiff's warehouse and thus work his injury. In doing this thing the defendant will take his property as much as if it took the tenement itself. Without air and light, it would be of little value. Its profitable management is secured by adjusting it in reference to the right obtained by his grantor over the adjoining property. The elements of light and air are both to be derived from the space over the land, on the surface of which the street is constructed, and which is made servient for that purpose. He therefore has an interest in that land, and when it is sought to close it, or any part of it, above the surface of the street, so that light is in any measure to his injury prevented, that interest is to be taken, and one whose lot, acquired as this was, is directly dependent upon it for a supply, becomes a party interested and entitled, not only to be heard, but to compensation. The easement is property within the meaning of the Constitution and the statutes authorizing the construction of the defendant's road, as well as the warehouse upon the lot, by which it was

used and enjoyed, and the owner is, in the language of the act of 1850 (Chap. 140, §§ 14, 15, 18), a person having an "estate or interest in real estate, so that if proceedings were instituted to condemn the street for railroad uses he would, as one of those persons, whose estate or interests are to be affected by the proceedings," be entitled to notice of the same (§ 14), and compensation (§ 16).

So under the act of 1866 (Chap. 697); it is supplementary to that of 1850, and embodies its provisions as to compensation, while the act of 1867 (Chap. 489), providing for the construction of an experimental line of railway in the counties of New York and Westchester, and under which the road of which the defendant is successor was empowered to act, declared that if in the course of its construction "private vaults or improvements are interfered with or occupied by said construction company, compensation therefor shall be paid by said company to the owner thereof," as in said act afterward provided (§ 6), and section 7 provides that any "private property used or acquired shall be compensated for by said company, under provisions of existing laws, authorizing the formation of railroad corporations, and the acquisition of rights of way therefor."

The plaintiff will also be within the terms of the provisions of the act entitled "An act further to provide for the construction and operation of a steam railway or railways in the counties of the State." (Chapter 606, Laws of 1875.) As, therefore, it is conceded that his consent to the proposed appropriation of the street has not been given, or compensation made or provided for, or the proceedings above referred to taken, it would seem plain that the cause of action stated in the complaint was made out. And here it will be well to examine the decisions already made by this court in cases arising under the act last cited, viz.: *Matter of the Petition of the N. Y. Elevated Railroad Company* (70 N. Y. 327), *Matter of Gilbert Elevated Railway Company*, (id. 361), and *Same* v. *Handerson* (id.). In these cases the rights of abutting owners, and the effect of the provisions of the statutes for compensa-

tion, to which I have referred, were discussed by counsel and largely considered by the court, and although the conclusions upon which judgment was given do not decide the point here involved, the declarations of the several judges concerning it cannot be disregarded. They were made with deliberation — in discussing the position taken in behalf of property owners, that certain portions of the act conferred power to appropriate the streets of the city to railroad uses, without requiring compensation for such rights of the abutting owners as would be affected thereby — and evidently had influence in bringing about the decisions rendered. They were thus more than *dicta* — they were part of the argument, and defined the boundaries by which, in the opinions of those judges, the act of the legislature was kept within the limits prescribed by the Constitution. EARL, J., says, " whether they " (abutting owners upon the streets) " have property rights therein for which they are entitled, under the Constitution, to compensation," " it will not be necessary to determine upon this appeal, for the reason that provision is made for compensation," And again, after referring to the same statute, under which the defendant claims, adds, " it seems to me there is no room for doubt that ample provision is made for any property rights the abutting owners may have in the streets." ALLEN, J., not only concurred in this statement, but added, " unless the statutes under which the petitioning corporation (the defendant here) claimed to exercise its privileges, did make provisions for compensation to individuals for every property right and interest, whether corporeal or incorporeal, which would be invaded or appropriated, in the construction and operation of the railway, they could not be sustained." He was, however, " of the opinion that the several acts, as a whole, did make ample provision for such compensation, and that every property right of individuals, including whatever right or interest, by way of easement, appurtenant to these lands or otherwise owners of lots abutting on such streets, have in such streets, as with those the fee of which is in the city, under the Laws of 1813, must under the Constitution and the statutes, under which these proceedings are had, be compensated

for." Whether such rights in abutting owners did exist, he expressed no opinion, but regarded it as an open question, "not having (as he said) been passed upon by the courts, or considered in any case in which the questions were involved." The other judges, CHURCH, C. J., and MILLER, J., who concurred in the result, express no opinion as to the steps by which it was reached, while others, RAPALLO and ANDREWS, JJ., agree with EARL, J., as to the necessity for compensation if such rights exist, but dissent from the conclusion upon the ground that sufficient provision for compensation was not made.

It would seem, therefore, that the effect of those decisions, as well as the facts and the provisions of the Constitution and statutes to which I have referred, bring the controversy before us down to the inquiry before stated, viz.: whether the plaintiff, as abutting owner, has any individual property right or interest in the street over which the structure in question is to be erected. I have already expressed an opinion that he has. The cases already adjudged lead to that conclusion. *Arnold* v. *Hudson R. R. R. Co.* (55 N. Y. 661) is of the first importance in its bearing upon the question already considered. It was elaborately argued by distinguished and able counsel in the Supreme Court, and the opinion there delivered is quoted and much relied upon by the learned counsel for the defendant here, as expressing the result of the current of authority, and in point to sustain the proposition stated by him, that unless property is actually taken in the physical sense of the word, compensation cannot be made. The importance thus given to the case permits a fuller notice of it than would otherwise be necessary. It appeared that A. was the owner of a factory, and also the right to take water from a certain pond situate some distance from the factory and in no way adjacent thereto, and also the right to carry the water over certain land of one Innes lying between the pond and the factory, "in a raceway or trunk, and either over or under the ground." He accomplished this by means of a trunk or raceway carried over it. The defendant acquired title to this intervening land by purchase, and became the owner in fee

thereof, for railroad purposes, removed the trunk and placed it underneath the soil "and rails laid down and used by them," to the plaintiff's damage. No compensation was made or proceedings taken to acquire his right. Upon action brought, he was nonsuited at the Circuit, upon the ground, among others, that the defendant did the act complained of in constructing its road, and under the authority of the statute through which it was organized; and the decision was upheld by the General Term. It was there held that the plaintiff's right was an easement or appurtenant to his mill property, and the defendant was to be deemed to have acquired its road-way in subjection thereto.

The question, therefore, was identical with the one before us, whether the acts of the defendant constituted a taking of the property within the meaning of the Constitution (*supra*), and GILBERT, J., said, that it was not to be regarded as an open one in this State, but as one settled by repeated adjudications— citing cases, which are relied upon by the respondent here. "They established," said the learned judge, "the principle that the legislature may lawfully authorize the construction of railroads and other works of a public nature without requiring compensation to be made to persons whose property has not actually been taken or appropriated for the use thereof, but who nevertheless suffer indirect or consequential damages by the construction of such works;" that the case was within that principle, and that no property of the plaintiff had been taken or appropriated by the defendant. "They may suffer," says the court, an injury by having the easement or servitude with which the road-way of the defendant is burdened, impaired, "but this," he adds, "is an injury which the property of the plaintiff suffers in consequence of the construction of a public work under legal authority, and not the taking of their property." Upon appeal, however, the judgment was reversed, this court holding, that A.'s easement was an interest in land, that it was property within the meaning of article 1, section 6, of the Constitution (*supra*), and therefore could not, nor could any portion of it, be taken for public use without ·

compensation, both for the taking of the right to carry above the surface, and the loss sustained by the diminution of power, and increased expense, and GROVER, J., says, "the value of the premises was necessarily impaired. The damages of the owner might, I think, have been assessed as provided for the condemnation of real estate, and thus the right to convey the water above the surface extinguished" * * * *. We have seen that the defendant did take the property of the plaintiff, and by the change it effected, impair its value. "Hence," he adds, "the cases cited by the counsel for the defendant, showing that when none of the land of the party is taken he cannot recover for the consequential injury thereto, caused by excavations, embankments, or structures lawfully made on other lands in the vicinity, have no application to this case."

We have here indeed a different element and a different medium by which the right of use is made available, but the principle is the same. Whether light crosses the open space unrestrained, or water is conveyed, by mechanical contrivance, over it, can make no difference. The right of unobstructed passage is alone in question in each case. In *Doyle* v. *Lord, et al.* (64 N. Y. 432; 21 Am. Rep. 629), a claim to an easement for the purposes of light and air, over a yard attached to a building, was upheld in favor of a lessee of part of the building, and his right to an injunction restraining the defendant from building upon the yard, established upon the ground that the easement went as appurtenant to the premises demised. The light passing into the windows from the yard was essential to the beneficial use of the store, and says EARL, J., "To this extent, in any view of the case, the plaintiffs were entitled to enjoy an easement in the yard. They were so far interested in it, that the defendants could not change its condition to their detriment." This rule established, it would follow that without compensation to the tenant and due proceedings at law, upon notice to him, the yard could not have been appropriated to railroad purposes, although the owner of the yard consented.

In *People, ex rel. Williams,* v. *Haines* (49 N. Y. 587), it was held, that although the proceedings then in question did not deprive the owner of the fee, and gave the public but an easement, it was such an interference with the property interests of the owner, as entitled him to the compensation made necessary by the Constitution as a condition precedent to the taking of private property for public use. " It was the imposition," says Allen, J., " of a burden upon the lands, subjecting them to an easement in behalf of the public, derogatory to the rights of the proprietor, and depriving him of the full and free enjoyment of them."

In *Eagle* v. *Charing Cross Railway Co.* (L. R., 2 C. P. Cases, 638), it was held that an easement was an interest in land, for the invasion of which compensation may be claimed, under the Land Clauses Consolidation Act (8 Vict., chap. 18), and the principle was applied to a claim made for compensation in respect to damages sustained in consequence of diminution of light to the plaintiff's premises by the erection near them of the defendant's works. The statute referred to is in some respects dissimilar to the provisions of those acts under which the defendant justifies, but if I am right in my conclusion that the plaintiff's easement was acquired by grant or agreement, the grounds upon which the decision was put are equally available here. Bovill, Ch. J., said : " The improvement is common to all the neighborhood, but the injury to the plaintiff's premises by the diminution of light is peculiar to the plaintiff. For the defendant, it was urged that the only right to compensation is in respect of damage to an interest in land — damage to the land itself ;" but different members of the court call attention to the fact before referred to by Bovill, Ch. J., saying the premises have sustained damage by reason of diminution of light, or have been affected thereby. Smith, J., said : " The invasion of a right of way, or of water, or of light, gives a cause of action," and disposing of the case in favor of the plaintiff — three judges delivering opinion — a critical examination is made of other decisions, including that of *Ricket* v.

*Metropolitan Railway Co.*, finally decided in the House of Lords (L. R., 2 H. L. 175), KEATING, J., saying: "It is now clearly settled," by that decision, "that compensation can only be claimed where land itself or an interest in land is injuriously affected; and that a damage to the plaintiff's trade by the obstruction of access to his premises by a public highway is too remote. In the present case, the award finds that the premises are directly injured by diminution of light."

BOVILLE, Ch. J., amplifies the suggestion made by him and above referred to, and SMITH, J., says, "the right which has been invaded here is a right to an interest in land, and the damage in respect of which the plaintiff claims compensation is not too remote, but is directly consequent upon the loss of the plaintiff's property in the light."

In *The City of Oswego* v. *The Oswego Canal Co. (supra)*, it appeared that certain of the plaintiff's streets were appropriated by the defendant, under an act of the legislature (Laws of 1823, chap. 241), for the construction of a canal. In denying their liability to the plaintiff, RUGGLES, Ch. J., says: "If the construction and maintenance of the canal, deprived any of them (referring to the proprietors of lands within the plan of the village as laid out by the surveyor-general) of their easement in the land derived from its dedication, it was a proper subject of appraisal," and EDMONDS, J., concurring, says: "There is nothing to show that these streets were public highways at the time the defendants were incorporated. All there is upon that subject is that the owner of the land sold it in lots, bounding them on those streets. This did not make those streets public highways. It gave, to be sure, certain rights to the purchasers of those lots in respect to the strips of land thus called streets, but that was all." What some of those rights are, I have endeavored to show. The case cited holds that they are property rights, and the loss of them a proper subject of compensation.

On the other hand, it is contended by the respondent, that the principles heretofore enunciated by the Supreme Court of the United States and the courts of this State as the grounds

of their decisions in other cases, and especially by this court in
*People* v. *Kerr* (27 N. Y. 188), and *Kellinger* v. *Forty-second
Street Railway Co.* (50 id. 206), known as the surface railway
cases, are at variance with this conclusion.     It is due, therefore,
to the importance of this case, and the elaborate and ingenious
argument submitted by the respondent, that the cases so referred
to be considered, viz. : *Transportation Co.* v. *Chicago* (99 U.
S. Rep. 635).     The claim against the city was for damages for
obstruction to the plaintiff's docks by the deposit of materials,
the construction of a coffer dam, and other work necessary in
the building of a tunnel for the extension of a city street.

The work was a necessary city improvement, and the inter-
ruption and obstruction was temporary — ceasing with the com-
pletion of the work.     It was held that the plaintiff could not
recover, and this upon the principle applied and practiced upon in
all our cities, that the municipality, whether owners of the fee of
the street, or vested with an easement only, may repair and im-
prove it, " to adapt it to easy and safe passage."     It permits the
leveling of a street by filling up, or digging away, and if inter-
sected by a stream, the erection of a bridge or tunnel.     If in doing
either of these things materials are necessarily collected, or an ex-
cavation made, to the present and temporary detriment of a lot-
owner, he cannot complain.     His ownership is subject to the
exercise of this public right, and he must submit to the incon-
venience in order that the street may be preserved.     So in
placing a pavement, or excavating for a sewer, the stone for one,
and the dirt from the other, may for a time incommode the lot-
owner.     To this, in like manner, he must submit, as to a burden
provided for in his grant, or as one of the terms implied by his
location upon a public avenue.

But the case would be quite different, if upon the coffer dam
used in the construction of the tunnel, or upon the piles of
rubbish or material, the city should erect a building, or from
them extend the girders of a railroad, and I find nothing in the
case cited which would prevent the lot-owner from maintaining
his action.     In *Corning et al.* v. *Lowerre* (6 Johns. Ch. 439),
KENT, chancellor, restrained the defendant by injunction from

obstructing Vesey street in New York city, by building a house thereon, holding it was not only a public nuisance, but a special grievance to the plaintiffs, affecting the enjoyment of their property, and the value of it, and working a special injury to them.

In accordance with the distinction which I have suggested between the character of the obstructing acts, is the decision in *Barney* v. *Keokuk* (94 U. S. Sup. Ct. 324), a case also cited by the respondent. It is there held that there is no substantial difference between streets in which the legal title is in private individuals, and those in which it is in the public, as to the rights of the public therein, that in either case the street is to be deemed open and free for public passage, and, agreeing in this respect with *People* v. *Kerr* (*supra*), for such other public uses as are necessary in a city, and do not prevent its use as a thoroughfare. Within this principle, its surface might be broken up for the insertion of gas or water-pipes, or sewers, or occupied by rails imbedded therein for surface railroad. But its limit would be found in these and like uses. It appearing, therefore, that the premises in question adjoined a wharf, affording access to a navigable stream, it was held, that a packet depot was reasonably located, on the ground that " it is a necessary adjunct to the steamboat landing, and the use of the wharf and levee for the purposes of navigation, and does not occupy any portion of the original street."

But on the other hand, the construction of a permanent freight depot in that street was deemed an unauthorized and improper occupation of it, because "subversive of and totally repugnant to the dedication of the street, as well as to the rights of the public."

The railroad structure designed by the defendant for the street opposite the plaintiff's premises is liable to the same objection as the house in Vesey street (*Corning* v. *Lowerre, supra*), and the freight-house in the case last cited. It is true that travel on the surface of the street would, notwithstanding its erection, still be possible, but fifteen feet above it the street is wholly occupied, and light detained from the abutter's lots.

The cases cited recognize private or special right in the individual, as well as a public right in a municipality — a substantial right and one to be protected.

Other cases cited' by the respondent (*Lansing* v. *Smith*, 4 Wend. 21, and *Gould* v. *Hudson River Railroad Co.*, 6 N. Y. 522) involve the right of the State to deal with the navigable waters therein. They stand upon the assertion of an exclusive public right, common to every citizen, and·deny a private right peculiar to an individual. But even in *Lansing* v. *Smith*, upon which the other rests, this right to regulate is stated by the chancellor to exist, "provided the legislature do not interfere with vested rights which have been granted to individuals." In the case before us there is in effect a covenant securing to the plaintiff's grantor a right peculiar to the individual, and necessary to the lot conveyed.

It *is* no doubt true that the grade of a street or highway may be altered by raising or lowering it, without liability on the part of the municipality to the abutter, but this is on the ground that the public had already paid a full compensation for all damage *to* be done by them to the adjacent owners by any reasonable or convenient mode of grading the way. But the principle applicable to such a case does not aid the defendant. There is no change in the street surface intended ; but the elevation of a structure useless for general street purposes, and as foreign thereto as the house in Vesey street (*Corning* v. *Lowerre*, 6 Johns. Ch. 439), or the freight depot (*Barney* v. *Keokuk, supra*). The plaintiff's case may also rest upon another ground. The tenure of the city, although, as I have assumed, in fee, is not absolute, but in trust for the purposes mentioned in the grant above referred to, and confers no other right or title upon the city than is given by the Street Opening Acts of 1691, 1787, 1801 (Colonial Laws, vol. 1, p. 8; Laws of 1787, chap. 88; Laws of 1801, chap. 129, or the act of 1813, 2 R. L. p. 408), entitled: "An act to reduce several laws relating particularly to the city of New York 'into one act,' where, in substantial repetition of the former acts, it is declared that the mayor, aldermen and commonalty of the city

of New York shall be seized of the lands taken for streets."
" In trust · nevertheless that the same be appropriated and left
open for or as a part of a public street, avenue, square or place
forever, in like manner as the other public streets in the said
city are, or of right ought to be."

The trial court has indeed found without qualification, that
the mayor, aldermen and commonalty of the city of New
York are the owners in fee of Front street opposite the plaint-
iff's premises, and if by this was intended any estate except as
limited by the purposes prescribed by the grant or by the
statute (*supra*), viz.: the uses of a street, it would be
necessary to sustain the plaintiff's exception thereto, and for this
alone reverse the judgment. The decisions already made (*Mat-
ter of Seventeenth St.*, 1 Wend. 262; *People* v. *Kerr*, 27 N. Y.
188; *Kellinger* v. *Forty-second St., etc., Railroad Co.*, 50 id.
206) show that the title is so limited. The argument of the
respondent, however, proceeds upon that view of the title of
the city, and the finding may be regarded as of that effect. It
is, however, urged by the respondent, that the trust imposed
upon the city is subject to legislative control. So far as the
public or the city is concerned, this may be conceded, but a dif-
ferent question is presented when the rights of an adjoining
owner are involved.

It is certainly well settled that where a grant is made
or trust created for a specific and defined purpose, the
subject of the grant or trust cannot be used for another and
foreign purpose without the consent of the party from whom
it was derived, or for whose benefit it was created. (*Trustees
of Watertown* v. *Cowen*, 4 Paige, 510; *Hunter* v. *Trustees of
Sandy Hill*, 6 Hill, 407; *Warren* v. *Mayor of Lyons City*, 22
Iowa [ Stiles ], 351.) We are not considering the right of the
corporation to part with whatever interest it possessed under
the dedication and trust, but the power of the corporation un-
der the legislature to deprive the owner of a lot fronting on land
so dedicated. It was somewhat discussed by SELDEN, J., in
*Williams* v. *N. Y. Central Railroad Co.* (16 N. Y. 107), and
bearing in mind that the reservation or grant in the case before

us was not unrestricted, but that the premises were to be kept open for the purposes of a street, the language of that learned judge is of weight here. His conclusion is that "it cannot be successfully contended, either that the dedication of land for a highway gives to the public an unlimited use, or that the legislature have the power to encroach upon the reserved rights of the owner, by materially enlarging or changing the nature of the public easement." Of course we do not overlook the fact, that in the *Williams Case*, the whole fee was in the plaintiff, subject to the easement in the city, while in the case before us a limited fee is in the city, subject to the easement in the plaintiff; but the right of the adjoining owner and that of the city are as distinct in the one case as in the other, and it can make no difference how that right or interest is designated. In each case the adjoining owner is entitled to have the premises kept open as a public street; whether acquired by grant or condemnation, it carried with it that burden or limitation to its use; and the owner of the lot has an estate or interest by way of easement over the street, to the *same* extent and of the same degree as he has in the land to which it is annexed or appurtenant. As that is in fee so the easement is in fee also. Thus Blackstone, speaking of incorporeal hereditaments (book 2, chap. 7, p. 102 [Cooley's ed., vol. 1], says: "The *dominicum* of property is frequently in one man, while the appendage or service is in another. Thus Gaius may be seized as of fee of a way leading over the land of which Titius is seized in his demesne as of fee," and DENIO, J., in *Child* v. *Chappell* (9 N. Y. 255), speaking of a right to use a canal basin and wharf as laid out on certain plans in partition, defines the idea the law attaches to such arrangements respecting real estate, and says: "The partition deeds in my opinion create a perpetual servitude, or in more modern language an *easement* in fee upon the undivided lands upon which the basin and wharf are situated, for the use and benefit of those parts of the original premises which were set off and released in severalty to the individual proprietors." And in *Milhau* v. *Sharp* (27 N. Y. 624), the court, speaking of streets in the city of New

York, say " the general rule that the fee is vested in the cor-
poration would not be absolutely incompatible with a remain-
ing fee in adjoining proprietors, under special circumstances. "
The dedication and the covenants in the deed, and the facts
surrounding the original grant make those circumstances here.
As the owner, therefore, might retain and control his own lot,
until by right of eminent domain it was taken from him, he
may by virtue of his easement, and for its protection, restrain
a use of the street which obstructs the access of light and air
to that lot, until by the same right the easement is taken from
him.

The street railway cases (*supra*) are in no respect in conflict
with this doctrine. The railroads in those cases were surface
roads ; no part of the land was rendered impossible to passage
with any vehicle or by any wayfarer ; when constructed there
was as there before had been " a way between two rows of
houses "—a street. The railway carriage was drawn along its
surface on rails prepared for it, and differed in this respect
alone from other means of transportation. There was nothing
exclusive in the character of the railroad, nor was its use " in-
consistent with any ordinary travel or passage over its tracks."
This characteristic is pointed out by EMOTT, J., in *People* v.
*Kerr* (*supra*) and the decision, as indicated by his opinion, and
that of WRIGHT, J., seems to have been put upon the ground,
that the maintenance of such a road did not impose a new
burden upon any property, either of individuals, or of the city
of New York. The act of the legislature permitting its con-
struction did not enlarge the use of the street as a highway
beyond the limitation or purpose of the trust, for execution of
which the fee was vested in the city.

In the subsequent case of *Kellinger* v. *Forty-second Street
Railway Co.* (*supra*) referring to the title of the city of New
York to the land on which the streets are laid, the court say :
" It is held, not as private property, but in trust for public use,"
with the further declaration that it was for the purpose of main-
taining public streets. That the case of *People* v. *Kerr* (*supra*)
was put upon the ground, that this trust was for the people of

the whole State, and consequently its absolute control and direction was in the legislature — "that legislative authority to construct a railroad on the surface of the streets, without a change of grade, was a legitimate exercise of the power of regulating public rights for public uses, and that the city was not entitled to compensation because it had, as a corporation, no property which was appropriated."

It seems to me that the positions upon which the judgment in these two cases rests have no place in the one before us. The use permitted was not inconsistent with the purposes of the trust. It was not denied that the abutting owner had ·a right to have the premises kept open above the surface. The question was not in either case. Here the facts show the erection of a framework and such a structure as will fill so much of the carriage-way of the street as is above fifteen feet above the road-way. I find no difficulty in agreeing with the views of the learned Judge EMOTT in *People* v. *Kerr*, and those of the ingenious and able counsel for the respondent as to the propriety of extending the law of city ways to meet the demands of a progressive civilization, but to uphold this judgment requires us to hold that the way may be extinguished. This cannot be done even by the legislature, without compensation to the abutting owner. It would be a perversion of law and reason to construe a trust to keep open land for street purposes, as subject to such regulation as would destroy the street, or enable the legislature or the municipality to grant away an exclusive right to any part of it. As we have seen, this was not done in the *Surface Railway Cases*, and it is precisely what, if the judgment before us is upheld, has been done here. So far as the public is concerned, it may stand. Not so as to the individual. As an abutter on the street, he has, as I have endeavored to show, a right to the light and air afforded by it. As to him, it would seem that the proceedings by which the land has been taken or the dedication made contain the terms of a contract, and if so, could be changed neither by· the city, of its own motion, or in the exercise of authority derived from the legis-

lature. (*People* v. *Morris*, 13 Wend. 328; *Sinking Fund Cases*, 99 U. S. 746.)

The particular purpose for which the land is taken is declared by the statute or by the grant in trust for that purpose. It also serves other purposes, and those purposes are not interfered with. Before any interest passed to the city, the owner of the land had from it the benefit of air and light. The public purpose of a street requires of the soil the surface only. Very ancient usage permits the introduction under it of sewers and water-pipes, and upon it posts for lamps. Of these things an abutting owner could not complain, but he is not required to hold his peace in the presence of such an erection as is threatened by the defendant; and as it will, when completed, be permanent, continually causing injury to him, the remedy by injunction for which he prayed was appropriate and should have been granted. (*Milhau* v. *Sharp*, 27 N. Y. 611; *Williams* v. *N. Y. C. R. R., Co.*, 16 id. 97.)

I also think the plaintiff may stand upon his first proposition, that he owns the fee of the street, and that the learned trial court erred in holding that the bed of Front street was excepted from the grants to which I have above referred. Front street was not then constructed. The description in terms embraces the land now occupied by it; and this I do not understand the learned counsel for the respondent to deny, but his argument is, that it was not intended to divest the city of the same title to Front street that it had in other streets, that "the clauses relating to the streets amount to a reservation of the streets from the operating clause of the granting part." I should rather say, that the effect of those covenants was to create in the city an incorporeal right — an easement fee — to have the land marked as streets kept open for public uses as such. If the grantee's covenant is literally construed, no other construction can be given to it; for the undertaking is to "construct the streets" on the lot granted.

The street, therefore, is to be erected over part of the land granted. Nothing is withheld or excepted from the grant — all passes. There is, however, the creation of an easement which

before had no existence. When the land was conveyed, this was separated from the right to the land, or reserved. No part of the land was excepted from the grant. The whole, including the bed of the street, passed by the conveyance, subject only to street uses. In *Richardson* v. *Palmer* (38 N. H. 212) a farm was granted " reserving to the public the use of the road through said farm ; also reserving to the White Mountains railroad the road-way for said road, as laid out by the railroad commissioners." The court say : " The design and operation of the exception in regard to the road-way of the White Mountain railroad can only be holden to be to subject the grant to the easement or right of user of that corporation, in the lands laid out for their road-way, while the lands themselves — the fee in the soil over which the railroad had been established — subject to that right or easement, passed to ' the grantee' under the deed." Many other cases are referred to by the appellant, to the same effect, and it seems to be well settled that such a right is not a right to the land, nor to any corporeal interest in the land, and the soil is in no sense the property of the owner of the right. The owner parts with no rights save such as are necessary to secure the land for street uses. Any other construction would defeat the grant, and should not be indulged in. (*Duryea* v. *Mayor, etc.*, 62 N. Y. 592 ; *Craig* v. *Wells*, 11 id. 315 ; *Starr* v. *Child*, 5 Denio, 599.) If this is so as to the original grants, we need spend no time in showing that the plaintiff succeeds to the rights so conveyed. There is no evidence that the grantors did not intend to convey their entire estate, so far as the street opposite the plaintiff's lot is concerned, nor to except his title from the operation of the general rule, that a lot bounded on a street extends to its center. Here the plaintiff's lot is so bounded. (*Mott* v. *Mott*, 68 N. Y. 246 ; *Bissell* v. *The N. Y. C. R. R. Co.*, 23 id. 61 ; *Perrin* v. *The N. Y. C. R. R. Co.*, 36 id. 120 ; *Wallace* v. *Fee*, 50 id. 694.) In whatever way, therefore, we view the plaintiff's case, the result is the same. A right of property in the street, with which, until properly appropriated and compensation made, the defendant cannot intermeddle.

This opinion was submitted to the court upon the first argument of this case. It has since been reargued with greater fullness than before, and a careful consideration of the points made by counsel has confirmed the views then entertained by me. As the judgment below is to the contrary, it should be reversed, and a new trial granted, with costs to abide the event.

TRACY, J. The principal question to be determined in this case is, has the plaintiff's property been taken for public use within the meaning of the Constitution of this State?

The plaintiff claims that by the true construction of the deeds from the city to his original grantors, the bed of Front (then Water) street was included in the grant, and that he is now the owner of the fee of one-half of the bed of Front street in front of his lots. But if this claim be not sustained, then he insists that, in the original grants of the premises in question, the city of New York covenanted with his grantors that Front street should be and remain an open street forever. That this covenant, being for the benefit of the abutting lands, is one running with the land, and the right or privilege secured thereby constitutes property within the meaning of article 1, section 6, of the Constitution, which provides that "private property shall not be taken for public use without just compensation."

The plaintiff's lots, numbers seven and nine, abutting on Front street, were formerly water lots, or lands under water. These lots, and the streets, were part of a larger tract owned by the city, which, prior to 1773, it caused to be surveyed and laid out into streets and lots and designated upon a map.

In May and December, 1773, the city granted and conveyed one of the plaintiff's lots, with other lands, to one De Peyster and the other lot to one Ellison. The boundary of the grant on one side began at Dock street, extending easterly across the street then shown on the map as Water (now Front) street, to what would be the westerly limits of the East river when the lands should be filled in and the streets mentioned in said grant made and constructed.

The plaintiff's lots are described as being upon the side of Water (now Front) street, as by the survey made of these and sundry other lots by Gerard Bancker, dated the tenth day of November, 1772, and filed in the office of the town clerk, as will more fully appear, with the appurtenances thereto belonging and appertaining.

The grantees covenanted and agreed to widen Dock street fifteen feet, and to build and construct a good and substantial street as so widened; to make and construct Water (now Front) street, and also to build and erect a good substantial dock or street on the outward boundary of their respective grants, and the deed then declares "which said several streets shall forever thereafter continue and be for the free and common passage of, and as public streets and ways for, the inhabitants of the said city, and all others passing through or by the same, in like manner as other streets of the same city now are, or lawfully ought to be." The trial court finds that the grantees made and constructed the several streets mentioned in the grant, and that the plaintiff is now the owner of said lots upon which " is erected a warehouse occupying the entire front, and four stories high." The defendant insists, and the trial court found, that, by the true construction of the deed, the bed of Front street was excepted therefrom, and never passed to the plaintiff's original grantors.

The necessary effect of this construction of the grant is to make the covenant found therein, that the said several streets shall forever thereafter continue to be public streets, a covenant of the city and not of the grantees; for we must assume that the covenant was made by the party who held the title to the bed of the street, and therefore had power to control its use, and not by one who had no title and consequently no such power. If the bed of the street was included in the grant, and the title thereto passed to the grantees, then it is even more clear that the covenant must be deemed the covenant of the city. The land designated on the map as a street, with other lands on both sides thereof and abutting thereon, being conveyed to private persons, could not become a street

except by proceedings taken for that purpose, or by a dedication of it by the owners to the public use, and its acceptance by the public.   Mere dedication is not enough; lands so dedicated do not become a public street until accepted by the public authorities.   The construction of the streets by the grantees in performance of the covenant on their part would amount to a dedication of the street to public use.   The covenant of the city that the streets when constructed should be, and remain, public streets forever, constitutes an acceptance by the city of the lands thus dedicated.   (*Oswego* v. *Oswego Canal Co.*, 6 N. Y. 257; *Lee* v. *Sandy Hill*, 40 id. 442; *Requa* v. *Rochester*, 45 id. 129; 6 Am. Rep. 52.)   Assuming the construction placed upon the grant by the court below to be correct, we have to consider the effect of such a covenant in a grant of land made by a municipal corporation having authority to lay out and open streets, and to acquire lands for that purpose.

Where an individual conveys village or city lots, designated upon a map as abutting upon a public street, the map being referred to in the deed, it is well settled that the grantee acquires, as against the grantor, a right of way over the strip of land referred to as a street, although the same may not in fact be a public street, not having been accepted by the public as such; yet, as between the parties to the grant, the land is deemed to have been dedicated to the public by the grantor, and he cannot thereafter appropriate said lands to any use inconsistent with their use as a public street. (*Oswego* v. *Oswego Canal Co.*, 6 N. Y. 257; *Cox* v. *James*, 45 id. 557; *Smyles* v. *Hastings*, 22 id. 217; *In re The Mayor, etc.*, 2 Wend. 472; *In re The Mayor, etc.*, 1 id. 262.)

The same rule applies to the State, or a municipal corporation when it deals with its lands as owner or proprietor.   (*City of Oswego* v. *Oswego Canal Co.*, *supra*.)

In the case 1 Wend. 262, the court says, in such a case the grantee " obtains a perpetual right of way over the space called a street."   In 2 Wend. (*supra*) in such a case, the court says, " a covenant will be implied that the purchaser shall have an ease-

ment or right of way in the street to the full extent of its dimensions."

The city of New York having power to lay out and open streets, and to acquire lands for such purposes had power to dedicate its own lands to such uses and to bind itself by a covenant with its grantees of abutting lands that a particular street should forever be kept as a public street. What interest then, if any, did the grantees acquire in the bed of the street by such grant and covenant?

M. purchased land in a village adjoining a public street, and it was at the same time agreed between him and the grantor that a triangular piece of land belonging to the latter, on the opposite side of the street, and in front of the land sold, should never be built upon, but should be deemed public property; and the grantor executed to the grantee a deed of the land sold and a bond for the performance of the agreement as to the triangular piece of land, both instruments being proved and recorded.

H. afterward purchased of the grantee the land opposite the triangular piece, after being informed by him of the privilege secured by the bond.

*Held*, by the chancellor, that H. was entitled to the benefit of the agreement, and that the grantee could not, without his (H.'s) consent, be permitted to make a new arrangement with the holder of the legal estate in the triangular piece, by which buildings should be erected thereon. That this right or privilege constituted an easement in the triangular piece. It was further held that easements are annexed to the dominant tenement and pass to the grantee of such estate. It was also held, that they are also a charge upon the estate of the servient tenement, and follow such an estate into the hands of those to whom such servient tenement or any part thereof is conveyed. (*Hills* v. *Miller*, 3 Paige, 256.)

The same question was again before the chancellor in the case of *The Trustees of Watertown, and White* v. *Cowen and Bagg* (4 Paige, 510), where it was again held that a grantee of a lot adjoining a public square, who has a special covenant

from the original owner of the ground that it shall be kept open for the benefit of his land may restrain the grantor from violating the covenant. · It was also held that a covenant in a deed of land not to erect a building on a common square, owned by the grantee in front of the premises conveyed, is a covenant running with the land, and was the grant of a privilege or easement which passed to a subsequent grantee of the estate without any special assignment of the covenant.

The principle of these cases was recently affirmed by this court in the case of *Phœnix Ins. Co.* v. *Continental Ins. Co.* (87 N. Y. 400).

In the case last cited, H. conveyed land to S. by deed, and the grantee covenanted for himself, his representatives and assigns not to erect, or cause to be erected, any building or erection on a certain specified part of the premises conveyed, which adjoined the remaining land of the grantor, and it was held, all the judges concurring, that such a covenant, both in respect to the burden and the benefit, adheres to and follows the respective parcels of land through all the devolutions of the title; and the right to enforce the covenant passed to the plaintiff as subsequent grantee of H. of the dominant tenement, and the covenant would be enforced by a court of equity against a subsequent purchaser of the servient tenement, who purchased with notice of the covenant. These cases are directly in point, and it follows that, by the law of this State as interpreted and held by its highest courts for the last fifty years without criticism or doubt, the grantees of the city, by force of their grant, acquired the right to have Front street kept forever as a public street. The street thus became what is known to the common law as the servient tenement, and the lots abutting thereon the dominant tenement. Such servitude constitutes a private easement in the bed of the street attached to the lots abutting thereon, and passed to the plaintiff as the owner of such lots. That an easement is property, within the meaning of the Constitution, cannot be doubted. This was expressly adjudicated in this court in the case of *Arnold* v. *The Hudson River Railroad Company* (55 N. Y. 661). Arnold owned a nail factory,

together with the right to take a certain quantity of water from a creek, and to convey it over or under the surface of intervening lands to such factory to propel machinery. For this purpose he built a trunk about six feet above the surface, through which the water was conveyed. In 1850, the defendant, having acquired title to a portion of the intervening lands, constructed tracks thereon, removed the portion of the trunk over said surface without Arnold's knowledge, and constructed another trunk under the lands, through which the water was conveyed and then raised by a pen-stock into the old trunk near the factory. *Held,* by the concurrence of all the judges voting, that Arnold's easement was property within the meaning of article 1, section 6, of the Constitution, and therefore could not — nor could any portion of it — be taken for public use without compensation.

·In *Doyle* v. *Lord* ( 64 N. Y. 432 ; 21 Am. Rep. 629 ), this court held that a lessee of a store had an easement for the purpose of light and air, in a yard attached to the building. In *Sixth Ave. R. R. Co.* v. *Kerr et al.* (72 N. Y. 330), this court also held that an easement in a public street may be condemned and taken for public use.

The next question to be considered is, has the plaintiff's property been taken by the defendant, within the meaning of the Constitution of this State? To constitute such a taking it is sufficient that the person claiming compensation has some right or privilege, secured by grant, in the property appropriated to the public use, which right or privilege is destroyed, injured or abridged by such appropriation. Has the plaintiff's easement in Front street been destroyed, or injured, by the appropriation of the street to the uses of the defendant's road? As we have seen, the plaintiff acquired nothing more than a right to have the street kept as a public street, and this must be deemed to be held subject to the power of the legislature to regulate and control the public uses of the street.

This brings us to the question whether the occupation of the street by the defendant's road is compatible with, or destructive of its use as a public street.

Front street is about forty-five feet in width, the road-way between the curbstones being about twenty-four feet wide.

The trial court has found as a fact that the defendant's road is to be constructed upon a series of columns about fifteen inches square, fourteen and a half feet high, placed about five inches inside the edge of the sidewalk and carrying cross girders, which support four sets of longitudinal girders, upon which are placed cross ties for three sets of rails for a steam railroad; that the girders are thirty-nine inches deep; the longitudinal girders thirty-three inches deep; that the line of columns abridges the sidewalk and correspondingly interferes with the street and thoroughfare where such columns are located thereon.

That the structure as proposed on Front street will fill so much of the carriage-way of the street as is about fifteen feet above the road-way. The effect of such structure the court finds will be to some extent to obscure the light of the abutting premises opposite to it, and will to some extent impair the general usefulness of the plaintiff's premises and depreciate their value.

Can the street be lawfully appropriated to such a structure without making compensation to the plaintiff for his easement therein? This is a question of power. If the legislature has power to authorize such a structure, without compensation, its exercise cannot be regulated by the courts. If one road may be authorized to be constructed upon two series of iron columns placed in the street, another may be authorized to be supported upon brick columns, or upon brick arches spanning the street. If a superstructure may be authorized which spans the entire carriage-way at fifteen feet above the bed of the street, one may be authorized which spans the entire street, from building to building, thus excluding light and air from the street and from the property abutting thereon. Thus an open street would be converted into a covered way, and so filled with columns or other permanent structures as to be practically impassable for vehicles. The city undertook and agreed with the plaintiff's grantors that Front street, when constructed by

them, should forever thereafter continue and be kept as a public street in like manner as other streets of the same city now are or lawfully ought to be. This fixes with definiteness and precision the character of the street which the parties to the contract intended to secure. As the other streets of the city were, or lawfully ought to be, so this street was to be ; it was to be an open street ; one which would furnish light and air to the abutting property, and a free and unobstructed passage to the inhabitants of the city. A covenant to keep a strip of land open as a public street forever is a covenant not to build thereon, and brings this case directly within the principle of the cases of *Hills* v. *Miller, The Trustees of Watertown, and White* v. *Cowen and Bagg,* and the *Phœnix Ins. Co.* v. *The Continental Ins. Co. (supra).* While the legislature may regulate the uses of the street as a street, it has, we think, no power to authorize a structure thereon which is subversive of, and repugnant to the uses of the street as an open public street. Whether a particular structure authorized by the legislature is consistent or inconsistent with the uses of the street as a street must be largely a question of fact depending upon the nature and character of the structure authorized.

The court below found that the series of iron columns abridges the street, and the superstructure erected thereon obscures the light to the adjoining premises, and depreciates the value of the plaintiff's property.

The extent to which plaintiff's property is appropriated is not material ; it cannot, nor can any part of it, be appropriated to the public use without compensation.

We think such a structure closes the street *pro tanto* and thus directly invades the plaintiff's easement in the street as secured by the grant of the city.

Whatever view be taken of the facts of this branch of the case, the same result must be reached. If the title to the bed of the street passed to the grantees of the city, then the public acquired a mere easement in the street, resulting from its dedication to public use, the easement resting upon the express covenant of the owner of the fee that the street shall be kept

as a public street forever. The fee remained in the owner making the dedication, and he having sold lots abutting upon the street, the purchaser, as we have already seen, obtained a perpetual right of way over the space called a street to the full extent of its dimensions. Whether the bed of the street was excepted from the grant of the city, and the title thereof never vested in the grantees, or whether the bed of the street was included in the grant and passed to such grantees, is of little importance, as in either event the plaintiff has a private easement of a right of way in the street, coupled with an express covenant that the entire space, marked on the map as Front street, shall forever be kept as a public street.

The defendant's railroad, as authorized by the legislature, directly encroaches upon the plaintiff's easement and appropriates his property to the uses and purposes of the corporation. This constitutes a taking of property for public use. It follows that such a taking cannot be authorized except upon condition that the defendant makes compensation to the plaintiff for the property thus taken.

The conclusion here reached is not in conflict with the determination of this court in the cases of *The People* v. *Kerr* (27 N. Y. 188), *Kellinger* v. *Forty-second St., etc., R. R. Co.* (50 id. 206), and other similar cases.

We agree with CHURCH, Ch. J., in the case last cited, that " it is not quite clear as to what was intended to be decided by the court in *The People* v. *Kerr*, relative to the rights of abutting owners."

In that case all of the private parties were abutting owners upon streets that had been opened under the act of 1813, whereby the city acquired the fee of the street, " in trust, nevertheless, that the same be appropriated and kept open for, or as a part of a public street, avenue, square or place, forever, in like manner as the other public streets in said city are, or of right ought to be." The only question which could have been there presented and determined, so far as the abutting owners were concerned, was whether the use to which the street was appropriated by the act authorizing the construction

of what are known as horse or street railroads, appropriated the streets to a use inconsistent with their use as open public streets.    Whether the rights of abutting owners in the streets were invaded, depended upon the nature and extent of the interest acquired by the public in the lands embraced therein. It is well settled that the State in the exercise of the right of eminent domain, or a corporation having the delegated power, may acquire such an interest or estate as in the judgment of the legislature the public services may demand. (*Heyward* v. *The Mayor of New York*, 3 Seld. 314.)   It may acquire the property in fee-simple absolute, or a qualified fee, or an easement merely, or the right to a temporary or permanent use of the property (*Sixth Avenue R. R. Co.* v. *Kerr*, 72 N. Y. 333), and the compensation to be made is regulated by the extent of the interest acquired.   The proceedings by which land is acquired by the exercise of the right of eminent domain amount to a statutory conveyance of the same to the public or the corporation, and there is no distinction between such a conveyance and a voluntary conveyance made for a public use.   Where property is acquired for public use by proceedings *in invitum*, the statute which authorizes the acquisition constitutes the contract between the citizen and the public ; and when the interest has once been acquired it cannot be changed or enlarged without further compensation.   It is only where the title is acquired in fee-simple absolute that the property may be converted to other public uses, or the particular use ceasing, it may be sold and conveyed, and converted to private uses.   (*Heyward* v. *The Mayor of New York*, 3 Seld. 314 ; *Brooklyn Park Commissioners* v. *Armstrong*, 45 N. Y. 239 ; 6 Am. Rep. 70.) But where the public acquire, not the property itself, but the mere right to use it for a particular purpose, the title of the former owner is not extinguished, but is so qualified that it can only be enjoyed subject to the easement.  In such case the title of the public is limited to the particular use, with the powers and privileges incident thereto, such as the right to use the timber and soil for the purpose of constructing and maintaining

the street. The former proprietor still retains his exclusive right in all mines, quarries, springs of water, timber and earth and may enjoy the beneficial ownership of the fee for every purpose not incompatible with the public use for which the land was taken, and may maintain trespass, ejectment, or waste (*Jackson* v. *Hathaway*, 15 Johns. 447; *The Presbyterian Society of Waterloo* v. *The Auburn & Rochester R. R. Co.*, 3 Hill, 567), and the use ceasing, the title reverts to the former owner, freed from the public easement.

By the act of 1813 the city acquired the fee in the street, in trust, however, for a particular public use. Conceding that this trust is for the benefit of the abutting owner, as well as for the public, the only right which he has in the street is the right to insist that the trust be faithfully executed. So long as the street is kept open as a public street, the abutting owner cannot complain. The question presented in the case of *People* v. *Kerr* was whether the particular structure there authorized was inconsistent with the continued use of the streets as open public streets of the city. Whether it was or not was a question of fact dependent upon the nature and character of the structure there involved. The court found and determined that it was not inconsistent with the public uses of a public street, but was in aid of such uses.

And in *Kellinger* v. *The Forty-second Street, etc., R. R. Co.* (50 N. Y. 206) this court limits the decision in the case of the *People* v. *Kerr* to a " simple declaration that the legislative authority to construct a railroad on the surface of the street without a change of grade was a legitimate exercise of the power of regulating the use of public streets for public uses."

The question whether the abutting owners upon streets opened under the act of 1813 had the right to prevent their being converted to a use destructive of their existence as public streets was not deemed by the court to be involved in that case.

This appears from the report of the case. DAVIES, J., did not sit in the case. ROSEKRANS, J., was of the opinion that the power of the legislature extended only to governing the mode of pass-

ing upon the surface of streets, and Judges BALCOM and MARVIN, concurring in the result, stated that "there might be a private right in the owners adjoining the street to have free access to their premises, held under the original proprietor, of the tract embracing the street, of which such owner could not be deprived by the assent or surrender of the public, or of the general owner of the fee of the street, or both, without compensation for his incidental interest or easement in the street. This they said to preclude the conclusion, if such a thing were possible, that any such interest had been disregarded. They saw no such question in the case." But the question which was not seen to be involved in that case is the only question involved in the case now under consideration. The question here presented is, not whether the legislature has the power to regulate and control the public uses of the public streets of the city, but whether it has the power to grant to a railroad corporation authority to take possession of such streets and appropriate them to uses inconsistent with and destructive of their continued use as open public streets of the city.

Had the act in that case authorized the corporations to take permanent and exclusive possession of portions of the street, to build sidings, and to permanently occupy them with rows of cars standing in front of the stores and residences of abutting owners, and to erect permanent depot buildings within the limits of the streets for the accommodation of their passengers, we cannot doubt that a different result would have been reached in that case. The fact that a particular structure is found to be consistent with the uses of a street is no evidence that a different structure is not inconsistent with such uses. The conclusion reached in the present case is based upon the character of the structure here involved. The language of WRIGHT, J., in *The People* v. *Kerr*, that the abutting owners have no property, estate, or interest in land forming the bed of the street in front of their respective premises to be protected by the right of eminent domain, must be construed with reference to the point thus being considered. This court had held in the case of *Williams* v. *The New York*

*Central R. R. Co.* (16 N. Y. 107) that where the public had acquired a mere right of way over the land of another, the laying down of railroad tracks and constructing a steam railroad in the street of a city was an enlargement of the use as understood and contemplated by the parties at the time the land was acquired, and imposed an additional burden upon the fee, and that such act could not be authorized without compensation to the owner.

This case was cited and relied upon in support of the claim of the abutting owners; but the answer was that the abutting owners did not own the fee of the street; that such fee being in the public, the legislature might lawfully appropriate it to any public use consistent with the trust for which it was held, notwithstanding such use of a street may not have been known or contemplated at the time the land was acquired. Having parted with the fee the abutting owner could not maintain trespass or waste, and against an act which did nothing more than to impose an additional burden upon the fee, he could not invoke the inhibition of the Constitution that private property shall not be taken for public use without compensation. Thus understood, we think the language of WRIGHT, J., not subject to criticism, and furnishes no support to the claim now made that the owner, whose lands were taken and are now held in trust, to be appropriated and used as open public streets forever, has no standing in court to insist that the trust shall be kept and that the streets shall not be destroyed.

This precise question was before the Supreme Court of the United States in the case of *Railroad Company* v. *Schurmeir* (7 Wall. 272). In deciding the case that court says: " Attempt is also made to justify the acts of the respondents (the railroad company) as grantees of the State, upon the ground that the complainant, in dedicating the premises to the public as a street, levee and landing, parted with all his title to the same, and that the entire title vested in fee in the State, respondents rely for that purpose upon the statute of the Territory of Minnesota. Suppose the construction of that provision, as

assumed by the respondents, is correct, it is no defense to the suit, because it is, nevertheless, true that the municipal corporation took the title in trust, impliedly, if not expressly, designated by the act of the party in making the dedication. They could not, nor could the State, convey to the respondents any right to disregard the trust, or to appropriate the premises to any purpose which would render valueless the adjoining real estate of the complainant."

That this trust created by the act of 1813 was intended to be for the benefit of the abutting owner, as well as for the public, we cannot doubt. City property has little or no value disconnected from the streets upon which it abuts. The opening of a city street makes the property abutting thereon available for the purposes of trade and commerce, and greatly enhances its value. The act of 1813 proceeds upon the assumption of this well-known fact, and the damages sustained by reason of the taking were assessed in view of the trust assumed by the public, that such lands were to be kept as open public streets forever. The public did not assume to take the lands in fee-simple absolute, but took and paid for a lesser estate ; and, in pursuance of the theory of the statute that the abutting owner has a special interest in the street, the cost of the lands was immediately assessed back upon the abutting property. All the owner has ever received for the lands taken under this act is the benefit accruing to his abutting property by reason of the trust for which the lands are held. Having surrendered his land in consideration of the trust assumed by the public, if the trust can now be abrogated and the streets surrendered to the uses and purposes of a railroad corporation, it follows that, by indirection, private property may be taken for public use against the consent of the owner, and without compensation.

We have examined the other cases cited by the learned counsel for the respondent, and in none of them do we find authority for the claim here made. The case of *The Transportation Company v. Chicago* (99 U. S. 635) is not in point. The injury there complained of was necessarily done in the exten-

sion of a city street.  The interruption was temporary, ceasing with the completion of the work.  This case is decided upon the elementary principle that the public have a right to make such use of the land taken for a street as may be deemed necessary for its proper construction, repair or maintenance. Within this power is included the right to fix the grade of the street, and to change such grade from time to time as the necessities of the public may require ; but, whether the grade be elevated or depressed, it is still a public street, to which the public have the right of free access, subject to such police regulations as may be adopted by the public authority having charge and control of the same.

The argument has been pressed upon our attention with great ability that as railroads, like streets, are intended to facilitate trade and commerce, and lands taken for either are taken for public use, the legislature may, in its discretion, appropriate the public streets of our cities to the use of railroad corporations, and this without reference to the form of their structure or the extent of the injury wrought upon property abutting thereon.  This is a startling proposition, and one well calculated to fill the owners of such property with alarm.  It cannot be that the vast property abutting on the streets of our great cities is held by so feeble a tenure.  This court has repeatedly held that such a rule has no application where the abutting owner owns the fee of the bed of the street; and we are of opinion that in cases where the public has taken the fee, but in trust to be used as a public street, no structure upon the street can be authorized that is inconsistent with the continued use of the same as an open public street.  The obligation to preserve it as an open street rests in contract written in the statute under which the lands were taken and which may not be violated by the exercise of any legislative discretion.  Whatever force the argument may have as applied to railroads built upon the surface of the street, without change of grade, and where the road is so constructed that the public is not excluded from any part of the street, it has no force when applied to a structure like that

authorized in the present case.    The answer to the argument
is that lands taken for a particular public use cannot be appro-
priated to a different use without further compensation ; that
the authority attempted to be conferred by the legislature
upon the defendant to take exclusive possession of portions of
the public street, and to erect a series of iron columns on
either side thereof, upon which a superstructure is to be erected
spanning the street and filling the road-way at fifteen feet
above the surface, thus excluding light and air from the adjoin-
ing premises, is an attempt to appropriate the street to a use
essentially inconsistent with that of a public street, and in re-
spect to the land in question violates the covenant of the city
made with the plaintiff's grantors, and in respect to lands ac-
quired under the act of 1813 violates the trust for which such
lands are held for public use.

The argument drawn from the great benefit which these
roads have conferred upon the city of New York can have
but little weight in determining the legal question presented in
this case.  No doubt these roads have added much to the aggregate
wealth of the city of New York, and have greatly promoted
the convenience of its citizens ; but the burden of so great a
public improvement cannot rightfully be cast upon a few of
its citizens, by appropriating their property to the public use,
without compensation.    The inhibition found in the Con-
stitution against the right of the sovereign to appropriate pri-
vate property to public use without making compensation
therefor was intended to secure all citizens alike against being
compelled to contribute unequally to the public burdens.

We are of opinion that the law under which the defendant
is incorporated authorizes it to acquire such property as may
be necessary for its uses and purposes, upon making compen-
sation therefor.    This was substantially determined in the
*Matter of New York Elevated Railroad* (70 N. Y. 327);
*Gilbert Elevated Railway Co.* (id. 361).

We have reached in this case the following conclusions:

*First.* That the plaintiff, by force of the grant of the city,
made to his grantors, has a right or privilege in Front street,

which entitles him to have the same kept open and continued as a public street for the benefit of his abutting property.

*Second.* That this right or privilege constitutes an easement, in the bed of the street, which attaches to the abutting property of the plaintiff, and constitutes private property, within the meaning of the Constitution, of which he cannot be deprived without compensation.

*Third.* That such a structure as the court found the defendant was about to erect in Front street, and which it has since erected, is inconsistent with the use of Front street as a public street.

*Fourth.* That the plaintiff's property has been taken and appropriated by the defendant for public use without compensation being made therefor.

*Fifth.* That the defendant's acts are unlawful, and as the structure is permanent in its character — and, if suffered to continue, will inflict a permanent and continuing injury upon the plaintiff — he has the right to restrain the erection and continuance of the road by injunction.

*Sixth.* That the statutes under which the defendant is organized authorize it to acquire such property as may be necessary for its construction and operation by the exercise of the right of eminent domain.

*Seventh.* The injunction prohibiting the continuance of the road in Front street should not be issued until the defendant has had a reasonable time after this decision to acquire the plaintiff's property by agreement, or by proceedings to condemn the same.


Earl, J. (dissenting.)  At the threshold of this case is presented the inquiry whether the plaintiff's lot extends to the center of Front street.  I think it does not, and in reaching this conclusion I assume, without deciding it, that the city, by its deeds of conveyance in 1773, granted the fee of the land where the street now is to Ellison and De Peyster.  Those deeds provided that the grantees should make certain streets through the lands conveyed, among which was the present

Front street, and that the streets after they were made should "forever thereafter continue and be for the free and common passage of and as public streets and ways for the inhabitants of the said city, and all others passing and returning through or by the same in like manner as the other streets of the same city now are or lawfully ought to be," and they contained a covenant that the grantees, their heirs and assigns, or some of them, should and would from and immediately after the streets were made and finished "forever thereafter, at his and their own proper cost, charge and expense, keep the same, from time to time, in good and sufficient repair, plight and condition." There is no evidence that the owners of the lots ever kept Front street in repair, but the evidence tends to show that the city from an early period kept it in repair either with its corporate funds or with funds realized by it from assessments upon the lot-owners. The intermediate deeds of the plaintiff's lot prior to the deed to him are not found in the case. But in the deed to him dated December 18, 1849, the lot is described as follows: "All that certain lot of land situate, lying and being in the first ward of the city of New York aforesaid, bounded northerly in front by Front street aforesaid, easterly by ground conveyed by John S. Conger and Sarah, his wife, to Elias H. Herrick by deed bearing date the first day of May, 1839, southerly by ground now or late of the said Elias H. Herrick, and westerly by Moore street aforesaid, containing in breadth in front in Front street thirty feet four and a half inches, and in the rear twenty-eight feet ten inches, and in length on either side eighty feet, be the same more or less." These precise measurements in feet and inches extend to the sides of the two streets only, and under such circumstances, how must the description in the deed be construed? It is a presumption of law that a conveyance of land bounded upon a highway carries with it the fee to the center of the highway as part and parcel of the grant, and the intention of the grantor to withhold his interest in a highway to the center of it, after parting with all his right and title to the adjoining land, is never to be presumed. But a grantor of

land abutting on a highway may reserve the highway from his grant, and such reservation will be adjudged, when it clearly appears from the language of the conveyance that it was intended. (*Jackson* v. *Hathaway*, 15 Johns. 447; *Fearing* v. *Irwin*, 4 Daly, 385; *English* v. *Brennan*, 60 N. Y. 609; *White's Bank of Buffalo* v. *Nichols*, 64 id. 65; *Kings County Fire Ins. Co.* v. *Stevens*, not yet reported [87 id. 287]; *Tyler* v. *Hammond*, 11 Pick. 193; *Union Burial Ground* v. *Robinson*, 5 Whart. 21.)

In *Jackson* v. *Hathaway* the description in the deed was "a certain tract of land beginning at a certain stake by the side of the road called the old Claverack road, etc., from which stake running east, twenty degrees south, two chains to another stake; thence south, thirty-two degrees west, seventeen chains sixty-four links, and thence" by specified courses and distances to the "first-mentioned bounds," and it was held, that the description did not include any part of the road; that "if a person over whose land a highway is laid out convey the land on each side of it, describing it by such boundaries as do not include the road or any part of it, the property in the road does not pass to the grantee, as it is excluded by the description in the grant; and it cannot pass as an incident, being in itself a distinct parcel of land, and the fee of one piece of land not mentioned in a deed cannot pass as appurtenant to another." In *Fearing* v. *Irwin* it was held that a description "beginning at a point on the north-easterly corner of" two streets "and running thence northerly along the north-easterly side" of one of them comes to the margin only. In *English* v. *Brennan* the description in a deed began as follows: "Beginning at the south-westerly corner of Flushing and Clermont avenues, running thence westerly, along Flushing avenue, twenty-five feet; thence southerly, at right angles to Flushing avenue, seventy-nine feet nine inches, to a point distant forty feet seven and a half inches westerly from the westerly side of Clermont avenue," and it was held that the title conveyed was confined to the margin of the streets, and, in the opinion of ANDREWS, J., it was in substance said that the presumption is

that the owner of land abutting on a highway owns to the center, but that it is much less strong in respect to lots in large cities; that in construing a grant of land adjacent to a highway, it is presumed that the grantor intended to convey his interest in the street, but that the presumption is rebutted if it appears by the description that he intended to exclude the street from the conveyance. In *White's Bank* v. *Nichols*, it was held that where a deed described the granted premises as beginning at the intersection of the exterior lines of two streets, the point thus established controls the other parts of the description, and lines running along the streets are thereby confined to the exterior lines of the streets. In *Kings County Fire Ins. Co.* v. *Stevens* it was held that the road-bed was excluded in the following description: " Beginning at a point on the southerly side of the Wallabout bridge road and adjoining the land now or lately belonging to John Skillimore," and after certain other courses, " north, forty-eight degrees and nine minutes west, five hundred and ninety-four feet, to the Wallabout bridge road, and thence along said road one thousand two hundred and twenty-five feet, to the place of beginning." In *Tyler* v. *Hammond* it was held that where a deed of land describes it as bounded on a road, but sets forth metes and bounds which plainly exclude the road, no part of the soil of the road passes by the grant. The particular description there was as follows: " Bounded north-westerly on Ann street, there measuring thirty-one feet six inches; north-easterly on Crudert alley, there measuring fifty feet two inches; south-easterly on Dock square, there measuring twenty-eight feet six inches, and north-westerly on the estate of the late Joseph Tyler, there measuring forty-eight feet." WILDE, J., used language quite applicable to this case: " This is a very particular description of the land intended to be conveyed, in respect to which there can be no doubt or uncertainty. The lines are short and were measured, no doubt, with great exactness, and therefore a mistake in the side lines of twenty or thirty feet cannot be supposed." In the case of *The Union Burial Ground Society* v. *Robinson*, the description in the deed there under considera-

tion was very like that contained in the deed to the plaintiff. It was as follows: " Containing in breadth on Prince street" (which ran parallel with Washington street and north of it) "thirty-one feet four inches, and in length southwardly between parallel lines running at right angles with Washington street on the east line thereof ninety-eight feet six inches, and on the west line thereof seventy-three feet six inches and two-thirds of an inch, be the same in depth more or less to Washington street, where it contains in breadth east and west thirty-one feet; bounded on the north by the said Prince street, on the south by the said Washington street," and it was held that the deed did not convey any part of the soil of Washington street.    KENNEDY, J., writing the opinion of the court, after laying down the rules which govern in the construction of such deeds, used language very pertinent to this case, as follows: " What is here said is particularly applicable whenever the quantity of land conveyed is small and its extent is described with great nicety, as in all conveyances almost of city or town lots or parts thereof, and in the present case the ground intended to be conveyed is described with a remarkable if not very unusual degree of nicety and minuteness, as if it were intended to preclude all possibility of including any more than came within the metes and bounds as set out, not merely in feet and inches but limited even to the very fraction of an inch."

But in addition to the precise measurements in plaintiff's deed limited not only to feet and inches but to a half inch, we have other circumstances bearing upon the construction to be given to the deed.    For a long time anterior to the date of the deed Front street had become like the other streets of the city, and had been maintained and kept in repair by the city. It owned the fee of nearly all the streets within its limits, and it must have been the common practice of conveyancers to exclude the streets from the grants of adjoining lots by confining measurements to the margin of the streets.    Reading the precise measurements in plaintiff's deed, in the light of these circumstances I think there is little ground for dispute that his

grantors intended to limit their grant to the margin of the street, and that such intent should have effect is shown by the authorities above cited.

Therefore as the plaintiff did not own any of the soil in Front street, it matters not where the title to it rested. As to him, it may be treated as if it were in the city, and I shall so treat it in the further discussion of this case.

Whatever private rights then the plaintiff has in this street are such and such only as belong to him as an abutter upon the street. Such rights as he has in common with the public generally cannot be enforced in this action or in any other action in his name. It is not disputed that to maintain this action the plaintiff must show that in violation of the acts under which the defendant was organized, and of the Constitution, "private property" of the plaintiff has been taken without compensation. It is not sufficient for him to show that he is injured or suffers damage from the construction or operation of defendant's railway, or that his adjoining property is deteriorated in value. He must show that his private property is in some proper sense *taken*, and to this effect are nearly all the authorities in this country, except in States where provision is made in the Constitution or laws that compensation shall be made for property damaged or injuriously affected, as well as for property taken. In Sedgwick on Statutory and Constitutional Law, 519, the learned author, speaking of the constitutional provision which prohibits the taking of private property for public use without compensation, says: "It seems to be settled to entitle the owner to protection under this clause the property must be actually taken in the physical sense of the word, and that the proprietor is not entitled to claim remuneration for indirect or consequential damages, no matter how serious or how clearly and unquestionably resulting from the exercise of the power of eminent domain." In Dillon on Municipal Corporation, § 784, it is said that "although the adjoining property may be injured, still it is not, in a constitutional sense, *taken* for public use." In *Transportation Co.* v. *Chicago* (99 U. S. 635), Judge STRONG said that "acts done in the proper

exercise of governmental powers and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action. This is supported by an immense weight of authority." In *O'Connor* v. *Pittsburgh* (18 Penn. St. 187), it was held, after two arguments of the case and much consideration, that the constitutional provision for the case of private property *taken* for public use extends not to the case of property injured or destroyed. See, also, the cases of *Hatch* v. *The Vermont Central R. R. Co.* (25 Vt. 49), and *Richardson* v. *The Vermont Central R. R. Co.* (id. 473), where will be found a very learned discussion of the subject and many observations quite applicable to this case. The same rule is laid down in *Radcliff's Executors* v. *The Mayor, etc., of Brooklyn* (4 N. Y. 195). It was there supported by such cogent reasons and full citation of authorities as to place it beyond question in this State, and it has received the uniform sanction of our courts.

Our attention is called to two cases (*Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; and *Eaton* v. *The B. C. & M. R. R.* 51 N. H. 504; 12 Am. Rep. 147), which are supposed to take a new departure in the construction of the constitutional provision we are now considering. They are spoken of in the subsequent case of *Transportation Co.* v. *Chicago* as "the extremest qualification of the doctrine" to be found; they hold that permanent flooding of private property may be regarded as a "taking," and thus they may be justified on the ground that there was a physical invasion of the real estate of the private owner and a practical ouster of his possession.

We should not be embarrassed by any subtle meaning to be given to the word "property" in the constitutional provision. The broad meaning sometimes given to it by law writers whose definitions are more apt to confuse than enlighten, or a meaning which can be evolved only by philologists and etymologists, was probably not in the minds of the framers of our Constitution;

they must be supposed to have used the word in its ordinary and popular signification, as representing something that can be owned and possessed and taken from one and transferred to another. In popular parlance there is a distinction between *taking* property and *injuring* property. If the word is to have the broad meaning given to it by Austin and certain German and French Civilians, to whose definitions our attention has been called, then it would include every interference with and injury or damage to land by which its use and enjoyment become less convenient or valuable. Such a sense has never been given to it or countenanced in any decision involving the constitutional provision as to taking private property. If the word is to have such a broad signification, then it was useless to provide in the English Land Clauses Act of 1845, that compensation should be made for land taken not only but also for land " injuriously affected," and in the Constitution and laws of some of the States that compensation shall be made for both land taken and land damaged.

I do not deem it necessary to define precisely what property rights abutting owners have in the streets of the city of New York adjoining their lots. I will assume, without deciding it, that the streets cannot be absolutely closed against their consent without some compensation to them; for the limitations upon the power of the legislature in reference to closing streets have not been precisely determined in this State. (*Brooklyn Park Comm'rs* v. *Armstrong*, 45 N. Y. 234; 6 Am. Rep. 70; *Coster* v. *Mayor*, etc., 43 N. Y. 399; *Fearing* v. *Irwin*, 55 id. 486.) If the plaintiff has an unqualified private easement in Front street for light and air and for access to his lot, then such easement cannot be taken or destroyed without compensation to him. (*Arnold* v. *The Hudson R. R. R. Co.*, 55 N. Y. 661.) But whatever right an abutter, as such, has in the street is subject to the paramount authority of the State to regulate and control the street for all the purposes of a street, and to make it more suitable for the wants and convenience of the public. The grade of a street may, under authority of law, be changed and thus great damage may be

done to an abutter. The street may be cut down in front of his lot so that he is deprived of all feasible access to it, and so that the walls of his house may fall into the street, and yet he will be entitled to no compensation (*Radcliff's Executors* v. *The Mayor*, etc., *supra*; *O'Connor* v. *Pittsburgh*, *supra*; *Callender* v. *Marsh*, 1 Pick. 418); and so the street may be raised in front of his house so that travelers can look into his windows and he can have access to his house only through the roof or upper stories, and all light and air will be shut away, and yet he would be without any remedy. The legislature may prescribe how streets shall be used, as such, by limiting the use of some streets, or the parts of streets, to pedestrians or omnibuses, or carriages, or drays, or by allowing them to be occupied under proper regulations for the sale of hay, wood or other produce. It may authorize shade trees to be planted in them, which will to some extent shut out the light and air from the adjoining houses. Streets cannot be confined to the same use to which they were devoted when first opened. They were opened for streets in a city and may be used in any way the increasing needs of a growing city may require. They may be paved; sidewalks may be built; sewer, water and gas pipes may be laid; lamp-posts may be erected, and omnibuses with their noisy rattle over stone pavements, and other new and strange vehicles may be authorized to use them. All these things may be done and they are still streets, and used as such. Streets are for the passage and transportation of passengers and property. Suppose the legislature should conclude that to relieve Broadway in the city of New York from its burden of travel and traffic it was necessary to have an underground street below the same; can its authority to authorize its construction be doubted? And for the same purpose could it not authorize a way to be made fifteen feet above Broadway for the use of pedestrians? When the streets become so crowded with vehicles that it is inconvenient and dangerous for pedestrians to cross from one side to another, can it be doubted that the legislature could authorize them to be bridged, so that pedestrians could pass over them, and that it could do this with-

out compensation to the abutting owners, whose light and air and access might to some extent be interfered with? These improvements would not be a destruction of or a departure from the use to which the land was dedicated when the street was opened; but they would render the street more useful for the very purpose for which it was made, to-wit: travel and transportation. If by these improvements the abutting owners were injured, they would have no constitutional right to compensation, for the reason that no property would be taken and the injury would be merely consequential. And if the public authorities could make these improvements, then the legislature could undoubtedly authorize them to be made by *quasi* public corporations, organized for the purpose, as it can authorize plankroad and turnpike companies to take possession of highways and take toll from those who use them.

So in process of time railways came to be used for transportation of persons and property; and a controversy soon arose whether they could be constructed in the streets of cities without compensation to the abutting owners. It was determined that they could not, when such owners owned the fee of the street. (*Wager* v. *The Troy Union R. R. Co.*, 25 N. Y. 526; *Craig* v. *The Rochester City & Brighton R. R. Co.*, 39 id. 404.) But where they do not own the fee they are entitled to no compensation, as no private property is taken from them within the meaning of the Constitution. That this is the rule was distinctly recognized in the two cases last cited and was adjudicated in the cases of *The People* v. *Kerr* (27 N. Y. 188), and *Kellinger* v. *The Forty-Second Street, etc., R. R. Co.* (50 id. 206). In the case of *The People* v. *Kerr* there was uncontradicted proof that the construction and operation of the railway in the street would cause serious damage to the owners of adjoining property, and that such property would be depreciated in value from twenty to twenty-five per cent, and the court found that the construction and operation of the railway "would be a material interference with and injury to the use and enjoyment of the lots fronting on said street in such manner and to such extent that the same

would constitute a continuous private nuisance to the plaint-
iffs" as owners of adjoining lots; and yet it held that the
abutting owners were not entitled to compensation. It
was adjudged that the construction of a city railroad upon
the surface of the street was an appropriation to public use;
that the street was under the unqualified control of the legis-
lature, and that any appropriation of it to a public use by
legislative authority was not a taking of private property so
as to require compensation to the city or abutting owners.
The decision seems to have been based upon the broad ground
that the legislature could authorize the land in the street which
had been taken for or dedicated to a public use to be devoted
to any public use whatever. But even if it did not go so far
as this, it cannot be disputed that it went so far as to hold that
the legislature could authorize the streets to be devoted to any
public use not inconsistent with their use as streets.

In *Kellinger* v. *The Street Railway Co.* the case of *The
People* v. *Kerr* was approved, and it was held that the owners
of property adjoining a street in the city of New York, laid
out under the act of 1813, have an easement in the street in
common with the whole people to pass and repass and also to
have free access to their premises, but that the mere incon-
venience of such access occasioned by the lawful use of the
street by a railroad is not the subject of an action; and that a
complaint alleging that defendant laid its track so near the
sidewalk in front of the plaintiff's premises as not to leave
sufficient space for a vehicle to stand, and that he and his
family were thereby incommoded in leaving and returning to
their residence, and the rental value of his premises was greatly
depreciated, did not contain a cause of action. CHURCH, Ch. J.,
speaking of the case of *The People* v. *Kerr*, said: "It clearly
holds that the abutting owners had no property in the street,
which was taken for the railroad, for which they were entitled
to compensation."

The decisions in these two cases were in no degree based
upon the fact that the railways were constructed upon the surface
of the streets. It can make no difference in principle whether

the railway be on the surface or above or below the surface so long as it serves the same public purpose, to-wit: the transportation of persons and property. The principle lying at the foundation of these cases, stated most favorably to the plaintiff, is that a railway was simply a new mode of using the streets for the purpose for which they were originally made, and that if the new use produced any greater inconvenience or injury to the abutting owners than the old use, it was *damnum absque injuria*. Nor did these cases proceed upon any distinction between horse railways and those upon which steam is the motive power. If the legislature could authorize a railway to be operated in any street by horse power, it certainly must have the same right to allow it to be operated by steam, electricity or any other motive power. As stated by the learned author of Thompson on Highways, 400, " The distinction between horse railroads and those on which steam is the motive power is not made by any of the cases in the Court of Appeals, but is expressly denied by some of them, and is in conflict with the reasoning and principle of all of them." In *Wager* v. *Troy Union R. R. Co.*, SMITH, J., writing the prevailing opinion, said : " It is true that the actual use of the street by the railroad may not be so absolute and constant as to exclude the public from its use. With a single track, and particularly if the cars used upon it were propelled by horse power, the interruption of the public easement in the street might be very trifling and of no practical consequence to the public at large. But this consideration cannot affect the question of right of property or of the increase of the burden upon the soil. It would present simply a question of degree in respect to the enlargement of the easement, and would not affect the principle." In the same case, SUTHERLAND, J., in his dissenting opinion, said : " In this case the railroad, I assume, was intended to be and was operated by steam. I cannot see how that affects the question of power." In *Craig* v. *Rochester City, etc.*, *R. R. Co.* (*supra*), MILLER, J., writing the opinion, said : " I am at a loss to see any apparent distinction in the application of the rule between cases where

steam power is employed and those cases where the road is operated by horse power." Judge Dillon, in his excellent work on Municipal Corporations, vol. 2, § 577, says: "Where the fee of the street is in the municipality in trust for the public, or in the public, the control of the legislature is supreme, and it may authorize or delegate to municipal bodies the power to authorize either class of railways to occupy streets without providing for compensation either to the municipality or to the adjoining lot-owners." In Cooley's Constitutional Limitations, 555, the learned author, speaking of the appropriation of the street to the use of all kinds of railroads, says: "A strong inclination is apparent to hold that, when the fee in the public way is taken from the former owner, it is taken for any public use whatever to which the public authorities, with the legislative assent, may see fit afterward to devote it in furtherance of the general purpose of the original appropriation, and if this is so, the owner must be held to be compensated at the time of the original taking for any such possible use; and he takes his chances of that use or any change in it proving beneficial or deleterious to any remaining property he may own or business he may be engaged in," and "when land is taken or dedicated for a town street it is unquestionably appropriated for all the ordinary purposes of a town street, not merely the purposes to which such streets were formerly applied, but those demanded by new improvements and new wants."

I think I have now sufficiently demonstrated that the legislature may authorize a surface railway operated by any motive power to be constructed in public streets, and that when the abutting owners do not own the fee of the streets they cannot claim any compensation for any inconvenience or injury caused them in the construction and operation of the railway, provided the street still remains open and practicable for the ordinary use of the public; and I am entirely unable to see why the reasoning and authorities which lead to this conclusion do not lead to the further conclusion that railways operated above the surface of the street may be authorized upon the same terms.

An elevated railway is only a new mode of using the streets for the transportation of persons and property. It is not a change or subversion of the use for which the streets were originally opened and laid. The time came when the increasing business and population of the city of New York made the surface railroads a necessity. The time has now come when the convenience and the wants of a vast city make this new mode of travel and transportation, if not a necessity, at least a great convenience; and the devotion of the streets to the use of the elevated railways was only in furtherance of the trust and purpose for which the soil of the streets was originally dedicated or taken. If the surface railways were raised up fifteen feet in the streets and used for the same purpose for which they are now used, could not an act of the legislature make them lawful structures without compensation to the abutting owners? As relates to the question of legislative power, what difference could it make whether a railway remained upon the surface or was raised up? Are the elevated railways unlawful elevated fifteen feet above the surface of the streets, while they would be lawful lowered to the surface of the streets? The legislature in regulating any street could build an embankment fifteen feet high and then authorize a surface railroad to be built upon that, to be operated by any motive power, and the noise and dust and interruption of air and light, and disturbance of privacy might be much greater than is caused by an elevated railway. Instead of building an embankment and thus raising the street, the legislature could authorize the whole travel of the street to be carried above the surface upon an elevated road by all the vehicles used for the transportation of persons and property, and the abutting owners could have no legal or constitutional ground of complaint. This is so because the fee which the city owns in its streets extends indefinitely upward and downward, and the space above as well as the space below a street may be utilized for street purposes.

I have not claimed that the legislature could, without compensation to abutting owners, authorize a street in the city of New York to be absolutely closed or wholly and exclusively

appropriated to the use of a railroad.   There are authorities which would tend to uphold such a claim.   I do not affirm or deny the validity of such a claim.   I leave the question of the right to exercise that more extensive legislative authority under the Constitution to be determined in some future case wherein it shall be involved.   It is sufficient to determine now that the legislature may constitutionally, without compensation to abutting owners, devote the streets of a great city to any use which is not inconsistent with the use for which they were opened or dedicated.

Front street, adjoining the plaintiff's lot, is not closed by this elevated railway, but it remains an open public street.   The finding of the court is that it "will cause no substantial or material impediment to the passage of persons, animals or vehicles in and along the street, and but slight obstruction to the light or air from the street."   We must take this case as the trial court has found it and not assume a case such as the imagination can paint.   The stream of traffic and travel with no material diminution can flow through Front street as freely as before the construction of the railway.   If it be a question of fact whether the street is in some sense closed by the defendant's structure, then the trial court must be deemed to have found the fact in favor of the defendant.

A steam railway operated upon the surface of one of the streets in the city of New York would probably be much more damaging than an elevated railway, and yet, as I have shown, it could undoubtedly be authorized without compensation to abutting owners; and it is impossible for me to perceive upon what reasoning or theory it can be claimed, that abutting owners who have no rights upon the surface of a street for which they can claim compensation, yet have such rights when the railway is elevated above the surface.   They have no easement upon or over the surface which cannot be interfered with and greatly impaired under legislative authority without compensation, and yet it is claimed that they have an easement somewhere up in the air which is under the constitutional protection as private property.   Where do these aerial rights come

from? They do not rest upon any grant, and as the doctrine of ancient lights has no footing in this country, they cannot rest upon prescription. Buildings may be erected upon a street so high and in such a way as to shut out light and air from an adjoining building. They may be erected so as to cast their shadows across the street upon houses there standing and yet no right or easement is invaded. It cannot be doubted that the legislature could authorize surface railways to be operated with double-decked cars fifteen feet high and thus cause nearly all the inconvenience to the abutting owners of an elevated railway, and yet it must be conceded that under the authorities the abutting owners would have no legal cause of complaint.

Light and air are mere incidents and accidents of a street. Streets are not constructed and maintained to furnish them. They come from a street because the street exists, and when the street disappears it is difficult to perceive how any right to them in an abutting owner survives. But as I have before said, it is sufficient now to determine that if there can be any such thing in a street as an easement for light and air, it is subordinate to all the uses and burdens to which a street may be subjected by the paramount authority of the legislature.

I am led to this conclusion by principles fairly to be deduced from decided cases which are binding upon this court as authority. I cannot perceive how this case can be determined in favor of the plaintiff without substantially overruling the cases of *The People* v. *Kerr*, and *Kellinger* v. *The Street Railway Co.* In *The Matter of the Gilbert Elevated Railway Co.* (70 N. Y. 361), Church, Ch. J., said that " the principles adjudicated in these cases will be regarded as obligatory upon this court in deciding future cases." In the case of *Kellinger* v. *The Street Railway Co.*, the same learned judge, speaking of the case of *The People* v. *Kerr*, said: " We should feel bound to adhere to this decision and its necessary legal results, even if we doubted its soundness, because large sums of money have been expended upon the faith of it, and in many obvious ways it has become a rule of property which

should never be abrogated, except for the most cogent reasons." And more than four hundred years before these utterances a learned English judge said: "If we judge against former judgments it is a bad example to the barristers and students of law; they will not have any faith in or give any credit to their books." (Year Book, 33 Hen. VI, 41.)

It is sufficient to say of the Elevated Railway cases reported in 70 N. Y., that the questions we are to determine in this case were not there involved. It was there determined that provision was made in the Rapid Transit Acts for compensation for any rights of private property which the abutting owners had in the streets of the city. But whether they had such rights or not was intentionally and expressly left an open question.

The plaintiff and many other abutters upon the streets through which this elevated railway is constructed undoubtedly suffer great damage from its operation and have the right to complain of the injustice done them; but they must seek their remedy by appealing, not to the courts, but to the legislature, and if they fail there, by appealing to the people who make legislatures. That is the final appeal open to every citizen who suffers injustice under the forms of the Constitution and the laws. The legislature undoubtedly has ample power to compel the defendant yet to make compensation to abutting owners for all the damage done them, and arrest the exercise of its franchises if it shall refuse to make such compensation. (*Monongahela Nav. Co.* v. *Coon*, 6 Penn. St. 379.) The power which it possesses under the Constitution and the laws to alter or repeal the charters of corporations includes the absolute right to regulate the exercise of corporate franchises, and to prescribe the terms and conditions upon which they may continue to be exercised. (*Albany Northern Railroad Co.* v. *Brownell*, 24 N. Y. 345.)

I will close this discussion by quoting the language of a very learned jurist in *Hatch* v. *The Vermont Central Railroad Co.*: "In the absence of all statutory provision to that effect no case

and certainly no principle seems to justify the subjecting a person, natural or artificial, in the prudent pursuit of his own lawful business, to the payment of consequential damage to others in their property or business. This always happens more or less in all rival pursuits, and often where there is nothing of that kind. One mill or one store or school often injures another. One's dwelling is undermined or its lights darkened. or its prospect obscured and thus materially lessened in value by the erection of other buildings upon lands of other proprietors. One is beset with noise or dust or other inconvenience by the alteration of a street, or more especially by the introduction of a railway, but there is no redress in any of these cases. The thing is lawful in the railroad as much as in the other cases supposed. These public works come too near some and too remote from others. They benefit many and injure some. It is not possible to equalize the advantages and disadvantages. It is so with every thing and always will be. Those most skilled in these matters, even empirics of the most sanguine pretensions, soon find their philosophy at fault in all attempts at equalizing the ills of life. The advantages and disadvantages of a single railway could not be satisfactorily balanced by all the courts of the State in forty years; hence they must be left, as all other consequential damage and gain are left, to balance and counterbalance themselves as they best can."

The judgment should be affirmed.


MILLER, J. (dissenting.) I concur generally in the opinion of EARL, J., in this case, and especially upon the ground that the questions presented are settled by former decisions of this court which are cited in the opinion.

It may be assumed, I think, that in reliance upon these decisions the railway of the defendant was constructed, and as a rule of property has been fully established thereby, upon which parties have acted and rights have been acquired, they should not be overruled or disturbed.

The judgment should be affirmed.

FINCH, J. (dissenting.) I concur in the opinion of my brother EARL. His full and careful argument renders unnecessary a further discussion, and yet the importance of the case, and the gravity of the questions involved, seem to require, at least, a brief statement of the grounds upon which I dissent.

If the abutting owners have rights in the streets, the public have such rights also; and where these come in collision, one or the other must, of necessity, yield. Even if we grant that such owners have some right in the streets growing out of their frontage upon them, and that such rights are in the nature of private property, it still remains that such private property ends where the people's right begins; that the abutting owner has no private property except outside of the public right, and whatever he does have is only that which is left after the latter is exhausted. The right of the abutting owner, such as it is, rests upon the trust on which the city holds the streets, and that is expressed in the covenant applicable to the street in question, which is, that it shall "continue and be for the free and common passage of, and as public streets and ways for, the inhabitants of said city, and all others passing or returning through or by the same in such manner as the other streets of said city are, or, of right, ought to be." I understand the meaning of this covenant to be, that Front street shall forever be kept open to the free and unobstructed travel and passage of the public, in the same manner as the other streets are kept open to such travel; and that the abutting owner gets the benefit of light and air and ventilation as the incidents of a due performance of that covenant. If, therefore, the city's covenant is observed, no right of the abutting owner is invaded, although the public shall use the street for travel and passage in a manner which lessens the light and air and ventilation which incidentally benefit such owner. If the street is kept open to free and unobstructed travel, and is used for the general passage of the inhabitants, the covenant is kept, and the abutting owner has received all his rights, even though his incidental benefits are lessened. The question then comes down to this: whether the construction and operation of the

elevated railroad is within the public right, and the trust upon which the city holds the fee of the streets. If it is, nothing has been taken from the abutting owners, for their right cannot enter the boundaries of the lawful public use; and the ultimate inquiry is simply and only whether the streets as used by the elevated roads are, nevertheless, used and occupied as public streets for unobstructed passage and travel, and kept open as such. There is no finding of fact to the contrary in the case before us, and no evidence from which such an inference can be justly drawn. The streets in question are kept open to the free and unobstructed passage of the inhabitants. They are not even partially closed to such travel. On the contrary what has been done has been done in the direct line, and in aid of the proper public use. Travel and passage have been aided, and their facility increased, instead of being obstructed and hindered. We are not to put our own eyes or observation in the room of the evidence and the findings of the trial court. These findings are not that the street has been closed, wholly or even partially; they are not that the public use and public travel have been hindered or obstructed. No such fact is in any manner found or furnished to us as a factor in the conclusion to which we ought to come. On the contrary, the only and the solitary fact found in such direction, the only one even pointing to a violation of the city's covenant, is the presence of the supporting columns, standing inside the curb of the sidewalk. If these are unlawful, then the lamp-posts, and the telegraph poles, and the supports for electric lights, are *pro tanto* a closing of the street, and utterly without right. We have, therefore, in the case as I read it, no evidence of a public use which transcends the public right; and that being so, no private right is or can be invaded, and no private property has been taken.

For reversal, ANDREWS, Ch. J., RAPALLO, DANFORTH and TRACY, JJ. For affirmance, MILLER, EARL and FINCH, JJ.

Judgment reversed.